Fred **ACKER** and Kenneth C. Dabrow, **Individually, and on behalf of all other persons similarly situated**

v.

**PROVIDENT NATIONAL BANK** and **Philadelphia National Bank, all national banking corporations.**

Civ. A. No. 72–2343.

United States District Court, E. D. Pennsylvania.

Feb. 27, 1974.

**58**

---

Michael P. Malakoff, Berger & Kapetan, Pittsburgh, Pa., Harold Rosenthal, Rosenthal & Gale, Philadelphia, Pa., for plaintiffs.

Robert S. Ryan, Melvin C. Breaux, Drinker Biddle & Reath, Philadelphia, Pa., for defendant Provident National Bank.

Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant Phila. National Bank.

## OPINION AND ORDER

HANNUM, District Judge.

On November 27, 1972, plaintiffs Fred Acker and Kenneth C. Dabrow brought this action individually and on behalf of a class of persons similarly situated against the defendants Provident National Bank and Philadelphia National Bank (hereinafter "Provident" and "PNB" respectively), to recover statutory damages for the alleged violation of the National Bank Act (12 U.S.C. §§ 85, 86), the Pennsylvania Goods and Services Installment Sales Act (Pa.Stat. Ann. tit. 69 § 1101 et seq. (1966)), the Pennsylvania Banking Code of 1965 (Pa.Stat.Ann. tit. 7 § 301 et seq.) and the Truth-In-Lending Act (15 U.S.C. § 1640).

The defendants presently, and for a period of two years preceding the filing of this complaint, have contracted to render "Master Charge" and "Bank-Americard" charge services to a large number of Pennsylvania residents. The "Master Charge" and "BankAmericard" credit plans are commonly referred to as revolving credit plans because of their unique features. A description of the chain of events involved in their issuance and implementation is as follows:

A person desiring to become a credit card holder of Provident Master Charge or PNB BankAmericard generally completes a written application and submits it to the bank for whose plan he is applying. Upon approval of the application, a written agreement is sent to the applicant and he is issued a plastic Master Charge or BankAmericard credit card with his name and account number impressed thereon. The cardholder agreements set forth the terms and conditions governing the use of the card, including the maximum amount of credit which the cardholder may have outstanding at any one time.

Under the cardholder agreement, an account is established at the bank on behalf of each cardholder who is then permitted (a) to borrow money from the bank through cash advances and (b) to purchase merchandise from various member merchants who have agreed with a Master Charge or Bank-Americard licensee, as the case may be, to honor the credit card, provided that the sum of borrowings and credit purchases does not exceed the maximum limit that has been established. PNB also imposes a separate maximum limitation on cash advances.

When a cardholder utilizes his card to purchase merchandise, he presents the card to the merchant when the purchase is made. The merchant fills out a sales slip describing the merchandise, which usually then is imprinted with the cardholder's number, and is signed by the cardholder. The merchandise and a copy of the sales slip are given to the cardholder.

The member merchant presents the sales slip, or slips, to Provident or PNB. The amount shown on the sales slip, less a percentage set by agreement between Provident or PNB and the merchant, is paid to the merchant, or credited to his account. When the cardholder disputes the sale quality or delivery of merchandise covered by the sales slip, Provident or PNB may collect from or charge back the sale to the member merchant.

The Master Charge and Bank-Americard plans are operated on the basis of billing cycles. The last day of the billing cycle is referred to as the "billing date", which is the same date of each month for each individual cardholder. The day immediately following the billing date is the first day of the next billing cycle. There are 12 billing cycles per calendar year. Provident's Master Charge billing system and PNB's BankAmericard billing system are processed by computer. Although transactions such as payments, credits and new charges to accounts are processed as the slips are received by Provident or PNB respectively, actual computations in the accounts, including calculation of charges, are made only once each billing cycle on the billing date.

On the billing date all transactions posted to an account during that billing cycle [e. g., purchases, payments and credits] are reviewed by the computer; the charge, if any, is calculated and imposed, and a summary of the resulting information is printed by computer on a statement [the "monthly statement"]. The monthly statement is mailed to the cardholder within a day or two after the billing date.

On the first billing date subsequent to the receipt of sales slips by Provident or PNB, the amounts and dates of new purchases are recorded on the monthly statement and the total of the new purchases is included on the statement as a part of the amount shown under the heading "New Balance". The remainder of the amount shown under the heading "New Balance" consists of previously outstanding balances less applicable payments and credits.

No charges are imposed on purchases when they first appear on the periodic statement as new charges. If the cardholder pays the entire outstanding balance of his account before his next billing date [a period of about 25 days] he will incur no charges on those new purchases. This feature is known as the "free ride" period. Some Master Charge and BankAmericard cardholders pay their entire outstanding balances each month and never incur any charges.

If the cardholder fails to pay the entire outstanding balance, a charge will be imposed on those purchases, but it will be computed only from the billing date on which the purchases first appeared on the monthly statement, and not from the date of the actual purchase.

Plaintiff Dabrow has been a Master Charge cardholder since June 1970 and he used his Master Charge Credit Card only for the purchases of goods and services. Dabrow and Acker have been BankAmericard cardholders since November 5, 1966 and March 11, 1970, respectively, and both have used their BankAmericard credit cards only for purchases of merchandise.

In their first count, the plaintiffs claim that the defendants' charge in excess of one percent per thirty days against their revolving credit accounts are usurious under the National Bank Act and the Pennsylvania Banking Code of 1965 in charging interest at a rate exceeding 12% per annum. The defendants contend that the Goods and Services Installment Sales Act, which permits a finance charge of 15% per annum, is the applicable statute.

In count two of the Complaint, the plaintiffs allege that both Provident and PNB, in determining the outstanding balance on which the finance charge is imposed, failed to deduct or otherwise take into account payments and credits that occurred subsequent to the previous billing date. This method of calculation

is known as the "previous balance method." The plaintiffs allege that since under this method the balance may represent a sum of money which may have been substantially paid the day after the carrying charge was imposed, the previous balance method of calculating interest violates the National Bank Act and the Goods and Services Installment Sales Act.

Plaintiffs have conceded that their allegation that the defendants employed the previous balance method of calculating finance charges was contrary to fact and they do not oppose the dismissal of count two.[1] Therefore, the defendants' motions for summary judgment on count two are granted.

In count three of the Complaint, the plaintiffs claim that it is unlawful to charge one and one quarter (1.25) per cent on their revolving credit accounts' outstanding balances every thirty days instead of every calendar month because the effect is to charge an annual percentage rate in excess of 1.25% per month allowed by the National Bank Act and the Goods and Services Installment Sales Act. Plaintiffs do not oppose the dismissal of count three as well as count two.[2] Therefore, the defendants' motions for summary judgment on count three are granted.

In count four, defendants are alleged to have violated the provisions of the National Bank Act and the Pennsylvania Goods and Services Installment Sales Act by charging interest on interest, i. e., by compounding interest, in computing the finance charge imposed on their revolving credit accounts.

In count five of the Complaint, plaintiffs allege that the defendants are understating the true annual interest rate on "Master Charge" and "Bank-Americard" charge accounts by disclosing an annual percentage interest rate based on a three hundred and sixty (360) day year instead of a calendar year in violation of the Truth-In-Lending-Act. It has been stipulated by the parties that Provident and PNB never used a 365/360 day method of accounting[3] and the plaintiffs do not oppose the dismissal of count five.[4] Therefore, the defendants' motions for summary judgment on count five are granted.

In the sixth and final count, the plaintiff, Kenneth C. Dabrow, claims that defendant Provident charged a monthly service charge in each 31 day month from November 28, 1970 to October 1971 in excess of 1.25% in violation of the National Bank Act and the Pennsylvania Goods and Services Installment Sales Act.

Thus, of the six counts listed in the plaintiffs' amended complaint, three (counts 2, 3 and 5) are no longer asserted by the plaintiffs. Counts one, four and six are still to be decided.

The case is here on the following·motions submitted by the parties: (1) the defendant Provident's motion to dismiss pursuant to Rule 12 of the Fed.R.Civ.P. on the ground that the Court lacks subject matter jurisdiction, (2) the defendant Provident's motion to dismiss the entire complaint pursuant to Rule 11 of the Fed.R.Civ.P. on the ground that it was filed without good ground to support it, (3) the defendant Provident's motion to dismiss counts 1, 4 and 6 under Rule 12 of the Fed.R.Civ.P. on the ground that as to these counts, the Complaint fails to state a claim upon which relief can be granted, (4) the motions of the plaintiffs and both defendants for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P., (5) plaintiffs' motion for class determination.

The Court will presently discuss the defendant Provident's motion to dismiss on the ground that the Court lacks subject matter jurisdiction and the motions of the plaintiffs and both defendants for summary judgment. As will presently

1. *See*, Statement of Agreed Facts #31 and Transcript of Oral Argument p. 56.

2. *See*, Transcript of Oral Argument p. 56.

3. *See*, Statement of Agreed Facts #31.

4. *See*, Transcript of Oral Argument p. 56.

be seen, this obviates the discussion of the other motions listed, i. e., renders them moot.

The third sentence of Fed.R.Civ.P. 56(c) provides for the immediate rendition of a judgment in the event that the matters considered by the Court on the motion for summary judgment disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5]

It appears to the Court that there exists no genuine issue as to any material fact in the matter now pending and that the motions for summary judgment may be decided.

Plaintiffs allege that this Court has jurisdiction over counts 1 through 4 and count 6 of their Complaint on the basis of 28 U.S.C. § 1337. That section provides, inter alia, that: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ." The plaintiffs also allege that this Court has jurisdiction under 28 U.S.C. § 1355, which provides that: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress."

The defendant Provident asserts that the jurisdiction of this Court may not be founded on either § 1355 or § 1337. Provident asserts that jurisdiction over actions against national banks alleging violations of state usury laws may be based only on 28 U.S.C. § 1348. Section 1348 states that:

"The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association

established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located. June 25, 1948, c. 646, 62 Stat. 933."

The issues raised by the defendant Provident concerning this Court's jurisdiction have been recently considered by three Circuit Courts, and a District Court in this Circuit, and in each case jurisdiction was found to exist under § 1337.

Cupo v. Community National Bank & Trust Company of New York, 438 F.2d 108 (2d Cir. 1971), was an action to invalidate the election of directors of a national bank. The plaintiff alleged that he was wrongfully denied election to a one-year term as director in violation of § 61 of the National Banking Act which guarantees the right of cumulative voting by shareholders of national banks. The *Cupo* court held that the National Banking Act is an act regulating commerce within the meaning of § 1337, relying on Murphy v. Colonial Federal Savings and Loan Association, 388 F.2d 609 (2d Cir. 1967) for its holding.

The *Cupo* case is followed by Partain v. First National Bank of Montgomery, 467 F.2d 167 (5th Cir. 1972) which involved a fact situation similar to the one in the present case. In *Partain,* three plaintiffs sued the First National Bank of Montgomery, under § 86 of the National Bank Act, for themselves and all other holders of BankAmericards issued by the defendant bank. The plaintiffs alleged that through the use of the credit cards the bank charged the plaintiffs and their class usurious interest—greater than that permitted by the Alabama Small Loan Act (Code of Ala., Tit. 5, § 290).

---

5. *See,* 10 Wright and Miller, Federal Practice and Procedure: Civil § 2725.

**62**

The *Partain* court stated that in Imm v. Union Railroad Company, 289 F.2d 858 (3d Cir. 1951) it was pointed out that there is an increasing recognition of the breadth of 28 U.S.C. § 1337. Professor Charles Bunn, Jurisdiction and Practice of the Courts of the United States 71–72 (1949), was quoted with approval as follows: " 'Acts regulating commerce' are coming rapidly to mean all acts whose constitutional basis is the commerce clause." *Imm* held specifically that the Federal Employers' Liability Act is an Act "regulating commerce" and that therefore the District Courts have jurisdiction of suits arising thereunder regardless of amount in controversy.

The court in *Partain* found that jurisdiction did exist under 28 U.S.C. § 1337, and cited both *Cupo* and *Murphy,* supra, for that proposition.

Burns v. American National Bank & Trust Co. and Fisher v. First National Bank of Chicago, 479 F.2d 26 (8th Cir. 1973) involved actions to recover usury penalties against national banks for plaintiffs and other members of their class under §§ 85 and 86 of the National Bank Act. In a combined en banc hearing, the Eighth Circuit joined both the Second and Fifth Circuits in holding that the National Bank Act is an "act regulating commerce" within the meaning of § 1337 providing for federal jurisdiction. The Eighth Circuit Court cited both the *Cupo* and *Partain* decisions for its position.

A recent case in this Circuit, Haas v. Pittsburgh National Bank et al., 60 F. R.D. 604 (D.C. Aug. 6, 1973) Civil Action No. 72–2343 involved an almost identical fact situation as the present case. The Haas case was a class action brought against defendant banks to recover damages for alleged violations of § 85 and § 86 of the National Bank Act, the Pennsylvania Goods and Services Installment Sales Act, the Pennsylvania Banking Code of 1965, and the Truth-

In-Lending Act, in connection with the issuance of BankAmericard and Master Charge card.

The defendants in *Haas*, contesting the jurisdiction of the district court, delved into a lengthy discussion of the history of legislation concerning national banks in this country, concentrating on the legislative history in the nineteenth century. The defendant Provident in the present case likewise discusses at length the history of legislation concerning national banks, with much of its discussion dealing with the nineteenth century. The *Haas* court rejected the defendants' argument that the Court lacked jurisdiction after considering the recent cases on the subject. The Court stated:

"Thus, in light of the *Burns, Cupo* and *Partain* decisions and the reasoning of the commentators, whatever may have been the state of the law during the time of John Marshall, today the National Bank Act is an act regulating commerce within the meaning of 28 U.S.C. § 1337 and thus § 1337 is sufficient to confer jurisdiction upon this Court." [6]

The defendant Provident asserts that § 1348 prohibits federal jurisdiction over suits against national banks unless there is a proper showing of diversity and jurisdictional amounts under 28 U.S.C. § 1331 or a federal question under 28 U.S.C. § 1332. This argument was dismissed in the opinions in both *Burns* and *Cupo, supra.* In both cases it was held that § 1348 does not prohibit federal jurisdiction in general over national banks. In *Burns, supra,* it was stated that § 1348 was intended to eliminate the right of national banks to claim original or removal jurisdiction exclusively on the ground that it was a nationally chartered corporation, and § 1348 was not intended to eliminate federal jurisdiction in general over national banks.[7] In addition, it should be noted that minimum jurisdictional amount and

6. Haas v. Pittsburgh National Bank et al., 60 F.R.D. p. 609 (D.C. Aug. 6, 1973) Civil Action No. 72–2343.

7. 479 F.2d at 28–29 (8th Cir. 1973).

diversity requirements are not applicable where one is suing under § 1337. Lyon v. Atlantic Coast Line R. Co., 224 F.Supp. 1014 (D.C.1964).

█ As mentioned above, § 1337 provides for jurisdiction in all civil actions arising under any Act of Congress regulating commerce. It should be noted that the defendant Provident does not argue that banking is not commerce, for as the Supreme Court stated in United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962), ". . . plainly, such an argument would have no merit." [8]

Accordingly, this Court has jurisdiction over counts 1, 4 and 6 of the plaintiffs' Complaint on the basis of 28 U.S.C. § 1337.

In count one the plaintiffs claim that the defendants' charge in excess of one percent per thirty days against their revolving credit accounts are usurious under the National Bank Act and the Pennsylvania Banking Code of 1965. The defendants argue that they have not violated those statutes by imposing a finance or service charge of up to 15% per year since they were entitled to impose such a charge under the Pennsylvania Goods and Services Installment Sales Act of 1966.

Thus, the issue involved in the first count is whether a revolving credit account such as is involved in this case is subject to a 12% limitation under the Banking Code of Pennsylvania or the 15% limitation imposed by the Pennsylvania Goods and Services Installment Sales Act.

█ The defendants Provident and PNB are national banks organized under the National Bank Act, 12 U.S.C. § 21 et seq.,[9] and, as national banks, they are controlled by it. Birdsell Mfg. Co. v. Anderson, 20 F.Supp. 571, affirmed 104 F.2d 340 (6th Cir. 1937). The rate of interest which a national bank may charge is governed by § 85 of that Act, which states that:

"Any association may . . . charge on any loan . . . or other evidences of debt, interest at the rate allowed by the laws of the State . . . where the bank is located, . . . and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter."

Thus, according to § 85 of the Act, the question whether the rate of interest charged by a national bank is usurious is decided according to the law of the state involved. Schumacher v. Lawrence, 108 F.2d 576 (6th Cir. 1940). The purpose of § 85 was to place the national banks on an equal footing with the state banks so they would not be limited by congressional restrictions in competing with the state banks. Meadow Brook National Bank v. Recile, 302 F.Supp. 62 (D.C.1969).

█ The Comptroller of the Currency is charged with the responsibility of prescribing rules and regulations that are considered necessary in order to carry out the provisions of the National Bank Act. 12 U.S.C.A. § 211. In Ruling 7.7310, 12 C.F.R. § 7.7310, 36 F.R. 17015, the Comptroller of the Currency provides as follows:

"(a) A National bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or morris plan bank, without being so licensed."

---

8. 374 U.S. at 336, n. 12, 83 S.Ct. at 1727.

9. Statement of Agreed Facts #3 and #4.

Thus, the National Bank Act allows national banks to charge the highest interest rate authorized by the state's laws on a specified class of loans. *See also,* Northway Lanes v. Hackley Union National Bank & Trust Co., 464 F.2d 855 (6th Cir. 1972).

■ Generally, any rate of interest above 6% in Pennsylvania is usurious on loans of less than fifty thousand dollars. Pa.Stat.Ann. tit. 41 § 3 (1971). However, all loans or forbearance of debts are not limited by the 6% ceiling. Different interest rates may be charged depending on, among other things, the type of loan involved. The Pennsylvania Small Loans Act, Pa.Stat.Ann. tit. 7 §§ 6151–6157 (1927), provides that licensees under the act may charge a rate of interest much in excess of the 6% generally authorized.[10] The maximum amount for loans under this act is six hundred dollars. The Pennsylvania Consumer Discount Company Act Pa.Stat.Ann. tit. 7 §§ 6201–6218 (Supp.1973) provides for both consumer loans and "revolving loan accounts."[11] Under the act, a two percent per month charge on unpaid balances on revolving loan accounts is authorized.[12] However, neither the Small Loans Act or the Consumer Discount Company Act apply to

banking institutions. By their very terms, these acts exclude any transaction involving a bank.[13]

The Banking Code of 1965 includes a provision on installment loans which is relevant to the bank credit card transaction.[14] A financial institution which offers a "revolving credit plan" may charge interest at a rate not exceeding one percent per month on the outstanding balance.[15] The service charge imposed by the defendant banks on cash advances obtained through the use of the bank credit cards is one percent per month or twelve percent per year.[16] Thus, this service charge on cash advances provided for in the bank credit card plans is permitted under the installment loan provision of the Banking Code. The plaintiffs contend that the same rate of interest is binding upon the defendant banks when they impose a service charge on bank credit card revolving charge accounts for the purchase of goods and services.

However, in 1966, subsequent to the passage of the Banking Code, the Pennsylvania General Assembly enacted the Goods and Services Installment Sales Act, which establishes a limitation of fifteen percent (15%) per year interest rate on revolving accounts arising out of

10. Pa.Stat.Ann. tit. 7 § 6152 (1967), the rates of interest permitted are as follows:
   " . . . three (3) per centum per month on that part of the unpaid principal balance of any loan not in excess of one hundred fifty ($150) dollars, and two (2) per centum per month on that part of the unpaid principal balance of any loan in excess of one hundred fifty ($150) dollars but not in excess of three hundred ($300) dollars, and one (1) per centum per month on any remainder of such unpaid principal balance."

11. Pa.Stat.Ann. tit. 7 § 6217.1 (Supp.1973).

12. *Id.*

13. In the Small Loan Act it is stated: "That this act shall not apply to any person, persons, partnership, association, or corporation operating under the laws relating to *banks, bank and trust companies . . . .*" Pa.Stat.Ann. tit. 7 § 6157 (Supp.1973) (emphasis added).

A similar provision is contained in the Consumer Discount Company Act, Pa.Stat.Ann. tit. 7 § 6217 (1967).

14. Pa.Stat.Ann. tit. 7 § 309(a) (1965): "An institution may make a charge for an installment loan which complies with the requirements of this section, at a rate not in excess of six dollars ($6) per one hundred dollars ($100) per annum computed on the original principal amount for the period of the loan. If such loan is one of a series of loans under an agreement ("revolving credit plan") providing a maximum outstanding balance of all such loans at any time, the institution may make a charge at a rate not in excess of one per cent per month on the actual outstanding balance of the loan."

15. *Id.*

16. *See,* Statement of Agreed Facts, Exhibits A and C attached hereto.

purchases of goods and services.[17] The Act covers the credit sale involving a revolving charge account or "Retail Installment Account." [18] "Retail Installment Account" is defined in the Act as follows:

> "Retail installment account" or "installment account" or "revolving account" means an account established by an agreement pursuant to which the buyer promises to pay, in installments, to a retail seller or to a financing agency, his outstanding balance incurred in retail installment sales, whether or not a security interest in the goods sold is retained by the seller, and which provides for a service charge which is expressed as a percent of the periodic balances to accrue thereafter providing such charge is not capitalized or stated as a dollar amount in such agreement." [19]

Of course, a bank issuing credit cards is not a retail seller,[20] but it might be a financing agency. The Act defines a financing agency as:

> " 'Financing agency' means a person engaged in this Commonwealth in whole or in part in the business of purchasing retail installment accounts from one or more retail sellers. The term includes but is not limited to a bank, bank and trust company, private banker, or investment company." [21]

Plaintiffs contend that Provident and PNB do not "purchase" indebtedness of the buyer from the retail merchant and that, therefore, the defendants are not financing agencies as that term is used in the Act. Provident argues at some length that the defendants do "purchase" indebtedness of the buyers from the retail merchants.[22]

However, the Court will not address itself to the merits of the plaintiffs' argument since it finds that the capacity of a financing agency is not dependent upon the "purchase" of the buyer's indebtedness. The Act provides that under the terms of the retail installment account the financing agency may either purchase "or acquire" indebtedness of the buyer to be paid in accordance with the agreement.[23] Even if it might successfully be argued that Provident and PNB do not "purchase" the indebtedness, it certainly can be decided that they at least "acquire" the cardholder's indebtedness from the retail seller.

Thus, PNB and Provident may qualify as "financing agencies" within the meaning of the Sales Act. Since the National Bank Act authorizes Provident and PNB to charge the highest rate of interest allowed by Pennsylvania Law, and since the Pennsylvania Goods and Services Installment Sales Act has been found to apply to Provident and PNB, it follows that the defendants are entitled to charge 15% a year against their revolving credit accounts. Thus, the plaintiffs' argument in count one must be rejected.

In their fourth count, the plaintiffs argue that if this Court finds that defendants are regulated by the Pennsylvania Goods and Services Installment

---

17. Pa.Stat.Ann. tit. 69 §§ 1904, 1905 (Supp. 1973).

18. Pa.Stat.Ann. tit. 69 §§ 1901–1911 (Supp. 1973).

19. Pa.Stat.Ann. tit. 69 § 1201(7) (Supp. 1973).

20. Pa.Stat.Ann. tit. 69 § 1201(3) (Supp. 1973).
   (3) " 'Retail seller' or 'seller' means a person engaged in the business of selling goods or furnishing services to retail buyers."

21. Pa.Stat.Ann. tit. 69 § 1201(16) (Supp. 1973).

22. Supplemental Brief of Defendant Provident in Support of Its Motions Under Fed.R.Civ.P. 12 and 56, pages 10–12.

23. Pa.Stat.Ann. tit. 69 § 1901 (Supp.1973) provides that:
   " . . . a retail installment account may be established by a financing agency on behalf of one or more sellers from whom the financing agency may, with the buyer's consent purchase *or acquire* indebtedness of the buyer to be paid in accordance with the agreement." (emphasis added).

Sales Act,[24] then the Court should find that the defendants are violating the provisions of that Act because the defendants compound interest (or charge interest on interest) in computing the finance charge imposed on their revolving credit accounts.

It is significant that there is no express language in the Goods and Services Installment Sales Act prohibiting the compounding of interest. Yet, the Pennsylvania legislature has prohibited compounding in express language in other Acts it has passed. The Pennsylvania Small Loans Act states that "Interest shall not be payable in advance or compounded . . . ."[25] Similarly, the Consumer Discount Company Act states that finance charges ". . . shall not be paid, deducted or received in advance or compounded but shall be computed and paid only as a percentage per month of the unpaid principal balance or portions thereof. . . ."[26] Therefore, it is the defendants' position that with respect to revolving charge accounts under the Goods and Services Installment Sales Act the imposition of finance charges on previously unpaid finance charges is not prohibited since the legislature failed to expressly so provide. This argument is a reasonable one and it is given additional weight by the fact that this method of computation providing for the compounding of interest appears to be actually authorized by the Act.

Section 1904 of the Sales Act provides that the finance charge shall be "computed on the *outstanding balances* from month to month." (emphasis added) Section 1905 of the Sales Act states in pertinent part the following:

"The seller or holder of a retail installment account shall promptly provide the buyer with a statement as of the end of each monthly period (which need not be a calendar month) setting forth the following:

(a) The balance due to the seller or holder from the buyer at the beginning of the monthly period.

(b) The dollar amount of each purchase by the buyer during the monthly period . . . .

(c) The payments made by the buyer . . . and any other credits to the buyer . . . .

(d) The amount of the service charge . . . .

(e) The total balance in the account at the end of the monthly period.

This section of the Sales Act presents a scheme which provides for a logical and carefully arranged sequence of calculations. The cyclical nature of this sequence of calculations is significant as it provides an indication that the Sales Act actually authorizes the compounding of interest with respect to delinquent revolving charge accounts.

To prepare a monthly statement under section 1905, first one takes the balance due at the beginning of the monthly period. To this "beginning balance," one adds any purchases made during the period and deducts any payments or credits. The amount of the service charge is then added, and the resulting amount in the account at the end of the monthly period is the total balance.

Taking the aforesaid logical cyclical nature of the computation described in Section 1905 into consideration, it is apparent that if the total balance in the account at the end of the monthly period were to go unpaid by the buyer, it would become the "beginning balance" at the commencement of the next monthly cycle. It is also apparent that the total balance if it were to go unpaid, would be equivalent to the outstanding balance from month to month on which Section 1904 states the finance charge is to be computed. Therefore, since the outstanding balance would appear to refer to the balance carried over from one month to the

---

24. The Court has so found. See pages 63 to 65 of this Opinion.

25. Pa.Stat.Ann. tit. 7 § 6152 (Supp.1973).

26. Pa.Stat.Ann. tit. 7 § 6217.1 (Supp.1973).

next, the outstanding balance would include the finance charge.

The plaintiffs further allege in their Amended Complaint that as a consequence of compounding or charging interest on interest on Master Charge and BankAmericard charge accounts, the defendants charged interest greater than that allowed by the Sales Act. However, the plaintiffs have stipulated that the plaintiffs were not charged over 15 percent effective interest.[27] Thus, even though compounding occurred, the compounding did not bring the effective rate of interest to a level in excess of that authorized by the Sales Act.

Defendant Provident has explained how this is possible. Basically, it results from two factors. The first factor is the "free ride" period made available to all account holders for the period between the posting of a purchase and the start of the next billing cycle, whether or not they have paid their balances on time.

The following example from the Perkins Affidavit illustrates the possible effect of the free ride period. On March 18, 1971, Mr. Dabrow charged a $260 purchase to his Master Charge account. The purchase was not posted to his account until April 14, 1971, 27 days later. The purchase first appeared on Mr. Dabrow's statement as of the May 10, 1971 billing date, an additional 27 days later.

If Mr. Dabrow had paid in full prior to June 10, 1971, no finance charge would have been imposed on the purchase, and Dabrow would have had the use of $260 for the period from March 18, 1971, through a date of payment posted as late as June 10, 1971, a total of 85 days. Since Dabrow did not pay his balance by June 10, 1971, charges were imposed for the period after May 10, 1971. However, under Provident's system, he still had the benefit of a "free ride" from March 18 to April 14,

1971, and from April 14 through May 10, 1971, a total of 54 days.[28]

The second factor described in the Perkins Affidavit which contributed to keeping the effective rate of interest to a level below 15%, even though compounding occurred, was the method of computation used by Provident. Generally, Provident rounded finance charges down to the next lowest full cent. If a payment was received in the middle of a billing cycle, Provident computed the daily balances by deducting from the principal the full amount of the payment, rather than the amount of the payment less the interest accrued to the date of payment. Finally, Provident did not impose full charges in August and September 1972.[29] This second factor alone had an effect approximately twice as large as the compounding effect.[30]

As a result of the "free ride" periods and the use of the method of computation which favored the credit cardholders, the effective rate of interest with respect to Mr. Dabrow's account remained under 15%:

| PERIOD | EFFECTIVE RATE PER ANNUM |
|---|---|
| 6/11/70–6/10/71 | 12.1% |
| 6/11/71–6/10/72 | 14.1% |
| Partial year, 6/11/72–11/10/72 | 13.2% [31] |

Accordingly, plaintiffs' allegations that the defendants are violating the provisions of the Pennsylvania Goods and Services Installment Sales Act by compounding interest must be rejected.

In addition to asserting that Provident and PNB compound interest on delinquent accounts, plaintiffs assert that Provident also compounds interest on non-delinquent accounts. Plaintiffs allege that Provident's outstanding balance ("previous balance"), upon which it imposes a monthly finance charge, includes the past month's finance charge on non-delinquent accounts. Plaintiffs

---

27. *See,* Transcript of Oral Argument May 4, 1973, p. 57 and p. 88.

28. Perkins Affidavit, #9–10.

29. Perkins Affidavit, #28.

30. Perkins Affidavit—Footnote 2, p. 10.

31. Perkins Affidavit, #31–32.

admit however, that PNB's outstanding balance ("previous balance"), upon which it imposes a monthly finance charge, never includes the past month's finance charge in non-delinquent accounts.

Plaintiffs claim that the following two hypothetical six month accounts prove that Provident compounds finance charges on non-delinquent accounts:

"Hypothetical 1—Philadelphia National Bank
(Non-delinquent account)

Month 1

| | | |
|---|---|---|
| (a) Previous balance | | 200.00 |
| (b) Month 1 payment | | 10.00 |
| (c) Balance for service charge computation | | 190.00 |
| (d) Service charge at .0125 per month | | 2.37 |
| (e) New balance | | 192.37 |

Month 2

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 1) | | 192.37 |
| (b) Month 2 payment | | 10.00 |
| (c) Balance for service charge computation | | 182.37 |
| (d) Service charge at .0125 per month | | 2.27 |
| (e) New Balance | | 184.64 |

Month 3

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 2) | | 184.64 |
| (b) Month 3 payment | | 10.00 |
| (c) Balance for service charge computation | | 174.64 |
| (d) Service charge at .0125 per month | | 2.18 |
| (e) New Balance | | 176.82 |

Month 4

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 3) | | 176.82 |
| (b) Month 4 payment | | 10.00 |
| (c) Balance for service charge computation | | 166.82 |
| (d) Service charge at .0125 per month | | 2.08 |
| (e) New balance | | 168.90 |

Month 5

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 4) | | 168.90 |
| (b) Month 5 payment | | 10.00 |
| (c) Balance for service charge computation | | 158.90 |
| (d) Service charge at .0125 per month | | 1.98 |
| (e) New Balance | | 160.88 |

Month 6

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 5) | | 160.88 |
| (b) Month 6 payment | | 10.00 |
| (c) Balance for service charge computation | | 150.88 |
| (d) Service charge at .0125 per month | | 1.88 |
| (e) New balance | | 152.76 |

Hypothetical 2—Provident National Bank
(Non-delinquent account)

Month 1

| | | |
|---|---|---|
| (a) Previous balance | | 200.00 |
| (b) Month 1 payment, posted 16th day | | 10.00 |
| (c) Balance for service charge computation | | |
| | 1st to 15th day | 200.00 |
| | 16th to 30th day | 190.00 |
| (d) Service charge at .0004166 per day | | |
| | First 15 days | 1.24 |
| | Second 15 days | 1.18 |
| | | 2.42 |
| (e) New balance | | 192.42 |

Month 2

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 1) | | 192.42 |
| (b) Month 2 payment, posted 16th day | | 10.00 |
| (c) Balance for service charge computation | | |
| | 1st to 15th day | 192.42 |
| | 16th to 30th day | 182.42 |
| (d) Service charge at .0004166 per day | | |
| | First 15 days | 1.20 |
| | Second 15 days | 1.13 |
| | | 2.33 |
| (e) New balance | | 184.75 |

Month 3

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 2) | | 184.75 |
| (b) Month 3 payment, posted 16th day | | 10.00 |
| (c) Balance for service charge computation | | |
| | 1st to 15th day | 184.75 |
| | 16th to 30th day | 174.75 |
| (d) Service charge at .0004166 per day | | |
| | First 15 days | 1.15 |
| | Second 15 days | 1.09 |
| | | 2.24 |
| (e) New balance | | 176.99 |

Month 4

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 3) | | 176.99 |
| (b) Month 4 payment, posted 16th day | | 10.00 |
| (c) Balance for service charge computation | | |
| | 1st to 15th day | 176.99 |
| | 16th to 30th day | 166.99 |
| (d) Service charge at .0004166 per day | | |
| | First 15 days | 1.10 |
| | Second 15 days | 1.04 |
| | | 2.14 |
| (e) New balance | | 169.13 |

Month 5

| | | |
|---|---|---|
| (a) Previous balance (New Balance Month 4) | | 169.13 |
| (b) Month 5 payment, posted 16th day | | 10.00 |
| (c) Balance for service charge computation | | |
| | 1st to 15th day | 169.13 |
| | 16th to 30th day | 159.13 |
| (d) Service charge at .0004166 per day | | |
| | First 15 days | 1.05 |
| | Second 15 days | .99 |
| | | 2.04 |
| (e) New balance | | 161.17 |

Month 6

| | | |
|---|---|---|
| (a) | Previous balance (New Balance Month 5) | 161.17 |
| (b) | Month 6 payment, posted 16th day | 10.00 |
| (c) | Balance for service charge computation | |
| | 1st to 15th day | 161.17 |
| | 16th to 30th day | 151.17 |
| (d) | Service charge at .0004166 per day | |
| | First 15 days | 1.00 |
| | Second 15 days | .94 |
| | | 1.94 |
| (e) | New balance | 153.11 [32] |

Plaintiffs assert that the $.35 difference between hypothetical 1 and 2 is "a result of Provident illegally compounding service charges on non-delinquent accounts." [33]

Rather, it appears to the Court that the difference between the finance charge imposed by PNB and that of Provident in the hypotheticals, results from the fact that PNB assumes all payments were received on the first day of the billing cycle, whereas Provident credits any payments made on the date received, not as of the first of the month.[34]

■ Provident claims that under its method, no finance charge is carried over into the following period unless no payment is made, i. e., unless the cardholder himself is delinquent. Indeed, the Statement of Agreed Facts supports this contention. Therein it is stipulated that at the end of each billing cycle Provident applies any payments received during the cycle first to the charge, and then to the principal balance, to determine the new balance at the end of the cycle.[35] This is in harmony with the general rule that a partial payment on a contract bearing interest is to be applied first to the interest, and then the excess of the payment is to be applied to the principal. Cusati v. Dellisante, 152 Pa. Super. 223, 31 A.2d 604 (1943).

■ Thus, under the Provident system no finance charge computed during any billing cycle in which a required payment is made is ever carried over into the next billing cycle, i. e., if a payment is made it acts to absorb the finance charge and prevents its inclusion in the next month's balance.

Therefore, the plaintiffs' assertion that Provident compounds finance charges on non-delinquent accounts must be rejected.

■ Upon motion, the Court granted plaintiffs leave to amend the Complaint to add an additional count six against Provident only. Count six asserts the following claim: Section 1904(a) of the Sales Act authorizes a monthly finance charge of 1.25% on outstanding balances from month to month. During the period from May 1970 to October 1971, Provident imposed on its Master Charge account balances a daily periodic rate of .04110%, which is the monthly equivalent of 1.27% in 31-day months (.04110% $\times$ 31 = 1.27% per month). Therefore, plaintiffs' contention in count six is that Provident violated the Sales Act—and the National Banking Act—by imposing a finance charge in 31-day months $\frac{2}{100}$ths of 1% above the monthly rate mentioned in 1904(a) of the Sales Act, although the same daily rate is the annual equivalent of 15% and the monthly equivalent of 1.23% in 30-day months and 1.15% in 28-day months.

Basically, the plaintiffs argue that defendant Provident was required to use a monthly rate of 1.25%. A calculation using this monthly rate would yield a higher finance charge per day in months containing 28 or 30 days than it would in months with 31 days.[36] This, of course, results from the application of

32. Plaintiffs' Brief in Opposition to Provident's Motion for Summary Judgment, pp. 45, 46, and 48.

33. *Id.* at 49.

34. There is no requirement under the Pennsylvania Goods and Services Installment Sales Act that a payment received at the end of the month be credited as of the first of the month.

35. Statement of Agreed Facts #32(c).

36. For example, 1.25% divided by 28 (the number of days in February) produces a daily rate of .04460%; whereas 1.25 divided by 31 (the number of days in January) produces a daily rate of .04032%.

the same rate (1.25%) over a shorter period of time. On the other hand, the application of a daily rate yields the same finance charge for each day, but varying totals for months containing 28, 30 and 31 days. Thus, as stated above, the daily rate of .04110% when applied to a 31-day month produces a charge of 1.27%; when applied to a 30-day month produces a charge of 1.23%; and when applied to a 28-day month produces a charge of 1.15%. In sum, the only difference between the daily rate method used by Provident, and the monthly rate method that plaintiffs feel Provident should have used, is that in the former the monthly rate will vary and the daily rate remain constant, while in the latter, the monthly rate remains constant and the daily rate varies. The end result, however, is exactly the same—a finance charge of 15% per year. There appears to be no indication that one method is less beneficial to the cardholder than the other, or any reason why the legislature would have intended to make either method illegal.

As already mentioned, plaintiffs have conceded that the defendants do not charge over 15% effective interest per year.[37] The Perkins Affidavit indicates that the effective rate on plaintiff Dabrow's account varied from 12.1% to 14.1%.[38]

As mentioned above, section 1904 of the Sales Act provides for a finance charge of 1.25% per month on the outstanding balance. From this section the plaintiffs conclude that the defendants are governed solely by the monthly rate of 1.25%. However, section 1905 of the Sales Act states:

"Sec. 1905 . . . The seller or holder of a retail installment account shall promptly provide the buyer with a statement as of the end of each monthly period (which need not be a

calendar month) setting forth the following:

. . . (d) The amount of the service charge, and the following statement: The service charge herein contained *does not exceed the equivalent of fifteen percent (15%) simple interest per annum* on the unpaid balance . . ."

This section indicates that the Pennsylvania legislature was concerned with an annual rate, i. e., 15% per year. It appears to the Court that the Pennsylvania Legislature would not require card issuers to tell purchasers that a service charge of up to 15% per year can be imposed, if in fact that was not the case.

Provident's position that it is the annual rate of 15% which controls is supported by an opinion issued by the Secretary of Banking of Pennsylvania. As mentioned previously, section 309 of Banking Code states that with respect to revolving installment loans ". . . the institution may make a charge at a rate not in excess of one percent per month on the actual outstanding balance of the loan." In response to a request that he clarify the method of computing the rate of interest on revolving credit loans, the Secretary of Banking in 1971 rendered an opinion in which he stated that:

§ 309 of the Banking Code of 1965 states that the charge shall be at a rate not in excess of one percent per month on the actual outstanding balance of the loan. Thus, to meet this requirement the charge must be determined on the basis of 365 days per year. The "daily periodic rate" is obtained by dividing 365 into the annual rate, which at one percent per month cannot exceed 12 percent. Using 12 percent the daily rate would then be .03287 which would be applied regardless of whether the month involved would contain 28, 30 or 31 days."[39]

---

37. Transcript 4 Oral Argument, May 4, 1973, p. 57 and p. 88.

38. Perkins Affidavit #31–#33.

39. Pennsylvania Bulletin, Vol. 1 No. 54, page 1476. Docket Number 71–1258, Filed July 2, 1971.

It should be noted that the daily rate mentioned by the Secretary as being in compliance with § 309 of the Banking Code can cause the monthly rate to exceed 1% in months with 31 days [.03287% $\times$ 31 = 1.02%]. This is permitted even though the Banking Code does not speak in terms of an annual rate. Since the Secretary of Banking has concluded that the annual rate controls even in a statute which does not expressly state an annual rate, it appears to the Court that an annual rate should apply where, as here, the statute itself mentions an annual rate.

For all the foregoing reasons, the defendants' motions for summary judgment on counts one, four and six are granted.