512 F.2d 729
 Fred ACKER and Kenneth C. Dabrow, Individually and on behalf
of all other persons similarly situated, Appellants,
v.
PROVIDENT NATIONAL BANK and Philadelphia National Bank, all
national banking corporations, Appellees.
 No. 74-1432.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1975.
Decided Feb. 21, 1975.
 
 Daniel M. Berger, Michael P. Malakoff, Berger & Kapetan, Pittsburgh, Pa., Harold Rosenthal, Rosenthal & Gale, Philadelphia, Pa., for appellants.
 Robert S. Ryan, Melvin C. Breaux, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee Provident National Bank.
 Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee Philadelphia National Bank.
 OPINION OF THE COURT
 Before ALDISERT, WEIS and GARTH, Circuit Judges.
 GARTH, Circuit Judge.
 
 
 1
 On this appeal, we are called upon to decide: (1) which of two arguably applicable statutes governs the rate of interest which national banks in Pennsylvania may charge on revolving credit card accounts;[1] and (2) whether the applicable Pennsylvania law allows the defendant banks to charge "interest-on-interest" in connection with such accounts. The district court held that the defendant banks could charge the 15% rate authorized by the Pennsylvania Goods and Services Installment Sales Act (hereinafter, "Sales Act"), rather than being limited to the 12% maximum rate established by the Pennsylvania Banking Code (hereinafter, "Banking Code"); and, that compound interest could be charged on the delinquent accounts. We agree with the district court that defendants may charge the higher interest rate (15%) authorized by the Sales Act. We do not agree that the Sales Act authorizes "interest-on-interest", and to that extent, we reverse.
 
 I. FACTS
 
 2
 Defendants, Provident National Bank (hereinafter, "Provident") and Philadelphia National Bank (hereinafter "PNB") are national banks organized under the National Bank Act 12 U.S.C. § 21 et seq., with offices in Philadelphia.[2] For a period of years preceding the filing of this complaint, both banks operated revolving bank credit card plans. The "Master Charge" and "BankAmericard" credit plans are commonly referred to as "revolving credit" plans because of their unique features. A description of the chain of events involved in their issuance and use is helpful to an understanding of the issues presented in this case.
 
 
 3
 A person desiring to become a credit card holder of Provident Master Charge or PNB BankAmericard generally completes a written application and submits it to the bank for whose plan he is applying. Upon approval of the application, a written agreement is sent to the applicant and he is issued a Master Charge or BankAmericard credit card with his name and account number. The cardholder agreements set forth the terms and conditions governing the use of the card, including the maximum amount of credit which the cardholder may have outstanding at any one time.
 
 
 4
 Under the cardholder agreement, an account is established at the bank on behalf of each cardholder who is then permitted (a) to borrow money from the bank through cash advances and (b) to purchase merchandise from various member merchants who have agreed with a bank operating a Master Charge or BankAmericard plan to honor the credit card, provided that the sum of borrowings and credit purchases does not exceed the maximum limit established. PNB also imposes a separate maximum limitation on cash advances. Both the Master Charge and the BankAmericard cardholder agreements provide that the Annual Percentage Rate imposed on the outstanding balances arising from the purchase of merchandise shall be fifteen percent (15%).
 
 
 5
 When a cardholder utilizes his card to purchase merchandise, he presents the card to the merchant at the time the purchase is made. The merchant imprints the sales slip describing the merchandise with the cardholder's number. The merchandise and a copy of the sales slip are given to the cardholder.
 
 
 6
 The member merchant presents the sales slip to Provident or PNB. The amount shown on the sales slip, (less a percentage set by agreement between Provident or PNB and the merchant), is paid to the merchant, or credited to the merchant's account.[3]
 
 
 7
 Both Master Charge and BankAmericard are operated on the basis of billing cycles. The last day of the billing cycle is referred to as the "billing date", which is the same date of each month for each individual cardholder. The day immediately following the billing date is the first day of the next billing cycle. There are 12 billing cycles per calendar year. Provident's Master Charge billing system and PNB's BankAmericard billing system are processed by computer. Although transactions such as payments, credits and new charges to accounts are processed as the slips are received by Provident or PNB respectively, actual computations in the accounts, including calculation of finance charges, are made only once each billing cycle on the billing date.
 
 
 8
 On the billing date all transactions posted to an account during that billing cycle (e. g., purchases, payments and credits) are reviewed by the computer. The finance charge, if any, is then calculated and imposed, and a summary of the resulting information is printed by computer on a statement (the "monthly statement"). The monthly statement is mailed to the cardholder within a day or two after the billing date.
 
 
 9
 On the first billing date subsequent to the receipt of sales slips by Provident or PNB, the amounts and dates of new purchases are recorded on the monthly statement and the total of the new purchases is included on the statement as a part of the amount shown under the heading "New Balance". The remainder of the amount shown under the heading "New Balance" consists of previously outstanding balances[4] less applicable payments and credits.
 
 
 10
 No charges are imposed on purchases when they first appear on the periodic statement as new charges. If the cardholder pays the entire outstanding balance of his account before his next billing date (a period of about 25 days) he will incur no charges on those new purchases. This feature is known as the "free ride" period. Some Master Charge and BankAmericard cardholders pay their entire outstanding balances each month and never incur any charges.
 
 
 11
 If the cardholder fails to pay the entire outstanding balance, a charge will be imposed on those purchases, but it will be computed only from the billing date on which the purchases first appeared on the monthly statement, and not from the date of the actual purchase. Whenever a cardholder fails to make timely monthly payment, both Provident and PNB impose a finance charge on a balance which includes the unpaid finance charge imposed in the previous cycle. Thus, both banks admit that they have charged compound interest on delinquent accounts.
 
 
 12
 Plaintiffs Dabrow and Acker have been BankAmericard cardholders since November 5, 1966 and March 11, 1970 respectively, and both have used their BankAmericard credit cards only for purchases of merchandise. Dabrow has been a Master Charge cardholder since June 1970 and has used his Master Charge Credit Card only for the purchases of goods and services.
 
 
 13
 Plaintiffs commenced this action as a class action in November 1972.[5] Thereafter both plaintiffs and defendants moved for summary judgment[6] as to all six counts of the Complaint.[7] On February 27, 1974, the district court held that its jurisdiction was properly invoked, and granted the defendants' motions.[8] Plaintiffs appeal only from the grant of summary judgment in favor of the defendants as to count one (alleging excessive interest charges) and count four (alleging the charging of "interest-on-interest").[9]
 
 II. BANK CODE (12%) OR SALES ACT (15%)
 
 14
 The rate of interest which can be charged by a national bank is governed by 12 U.S.C. § 85.[10] In effect, the National Bank Act "defers" to the laws of the state in which a national bank is located to establish the interest rate which the national bank can charge. Pennsylvania, however, has two different "interest rate" statutes, each of which is arguably applicable to bank operated revolving credit card plans. Section 309 of the (Pennsylvania) Banking Code of 1965, 7 P.S. § 309, provides for a rate not to exceed one percent (1%) per month, or twelve percent (12%) per year on the actual outstanding balance.
 
 
 15
 Installment loans (including revolving credit plans)
 
 
 16
 (a) Maximum rate-An institution may make a charge for an installment loan which complies with the requirements of this section, at a rate not in excess of six dollars ($6) per one hundred dollars ($100) per annum computed on the original principal amount for the period of the loan. If such loan is one of a series of loans under an agreement ("revolving credit plan") providing a maximum outstanding balance of all such loans at any time, the institution may make a charge at a rate not in excess of one per cent per month on the actual outstanding balance of the loan.
 
 
 17
 Section 1904 of the (Pennsylvania) Goods and Services Installment Sales Act provides for an interest rate on retail installment accounts not to exceed one and one-quarter percent (11/4) per month or fifteen percent (15%) per year.
 
 Rates of service charge on accounts
 
 18
 Subject to the other provisions of this article the seller or holder of a retail installment account may charge, receive and collect the service charge authorized by this act. The service charge shall not exceed the following rates computed on the outstanding balances from month to month:
 
 
 19
 (a) On the outstanding balance, one and one-quarter percent (11/4) per month.
 
 
 20
 Plaintiffs contend that the twelve percent (12%) rate of the Bank Code establishes the maximum interest rate which national banks can charge on their revolving credit card plans. Defendants contend that they are authorized to charge up to fifteen percent (15%) under the Sales Act.
 
 
 21
 A. The Credit Card Transaction as a "Loan."
 
 
 22
 Plaintiffs contend that both the Master Charge and the BankAmericard cardholder agreements constitute "loans" within the meaning of § 309 of the Bank Code.
 
 
 23
 In support of this argument (that a bank-operated revolving credit card account more closely resembles a "loan" than a "credit sale"), plaintiffs focus, first, on various "loan" characteristics of the transaction:[11]
 
 
 24
 (1) The parties to the cardholder agreement are the bank and the customer, rather than the merchant and the customer.
 
 
 25
 (2) Both the sales slip and the cardholder agreement require the customer to make payment directly to the bank.
 
 
 26
 (3) The deferred payment feature of credit card transactions involves the "forbearance of a debt" (i. e. "loan") by the issuing bank.
 
 
 27
 (4) The bank does not "sell" retail goods but "loans" money so that goods may be purchased.
 
 
 28
 Plaintiffs urge that these characteristics, among others, call for application of the Bank Code (governing "loans") rather than the Sales Act (governing "credit sales") to defendants' revolving charge plans.
 
 
 29
 Second, plaintiffs refer to an Opinion of the Pennsylvania Attorney General, 1960 Pa. Att'y Gen.Op. No. 231, cited in 23 D & C2d 136 (1961), concerned with the question of whether a bank, which operated a revolving credit card plan, was limited by the maximum interest rates of the General Usury Statute or the Bank Code. The Attorney General wrote
 
 
 30
 ... The buyer, as far as the bank is concerned, is a borrower. The bank is not a retail merchant selling goods on credit.
 
 
 31
 You are, therefore, advised that a bank participating in a revolving credit plan ... cannot charge more than $6.00 per hundred per annum collected in advance on amounts up to $3,500 without violating section 1001A(4) of the Banking Code...[12]
 
 
 32
 Third, plaintiffs direct our attention to cases in which Master Charge and BankAmericard plans have been held subject to state usury laws governing the "loaning" of money. See, e. g. Partain v. First National Bank of Montgomery, 467 F.2d 167 (5th Cir. 1972); Master Charge v. Daugherty, 123 Cal.App.2d 700, 267 P.2d 821 (1954); but see Kass v. Central Charge Service, Inc., 304 A.2d 632 (D.C. Court of Appeals 1973); Kass v. Garfinckel, 299 A.2d 542 (D.C. Court of Appeals 1973) (en banc); Uni-Serv Corp. v. Commissioner, 349 Mass. 283, 207 N.E.2d 906 (1965).
 
 
 33
 We are satisfied that bank-operated revolving credit card plans in Pennsylvania are not "loans" governed by the Bank Code.12A In the first instance, we recognize that the Attorney General's Opinion on which plaintiffs rely predated the Sales Act (1966) by more than five (5) years. Second, there is equally persuasive authority for the proposition that bank-operated revolving credit card plans involve "credit sales"-not "loans." In Kass v. Garfinckel, supra, the District of Columbia Court of Appeals cited with approval the reasoning of the trial court as follows:
 
 
 34
 " '... When we look beyond trappings to substance, we see that a charge account with defendant enables customers to make purchases at defendant's stores on a deferred payment basis without the need to pay in cash. In return for that consideration the customer agrees to pay a credit service charge under certain circumstances. He has it within his control to avoid all such credit charges, or he may take advantage of the deferral option and pay an amount of up to 18 percent per year. This is not the stuff of a loan or forbearance....' "
 
 
 35
 299 A.2d at 543. Then in Kass v. Central Charge Service Inc., supra, it was held that:
 
 
 36
 " '... Although the arrangements entered into by Central Charge are slightly different from those employed in retailer-operated revolving charge account agreements, they are sufficiently similar to entitle Central Charge to the same beneficial exemption from the usury laws being accorded retailers who operate their own plans....' "
 
 
 37
 304 A.2d at 634 (citing with approval the analysis of the trial court). In the second Kass case, the District of Columbia Court of Appeals relied upon Uni-Serv Corp. v. Commissioner, 349 Mass. 283, 207 N.E.2d 906 (1965). There, the Supreme Judicial Court of Massachusetts held that a credit card plan, similar to those at issue in the present case, was:
 
 
 38
 ... (E)ssentially a time sales financing arrangement in which credit is extended for the sole purpose of purchasing goods or services from stores participating in the plan ... The fact that the ultimate creditor is Uni-Serv and not the seller of goods or services is likewise of no consequence. ...
 
 
 39
 207 N.E.2d at 908. Finally, we do not believe that affixing the label "loans" to Master Charge and BankAmericard plans automatically requires application of the Bank Code (12%) rather than the Sales Act (15%). It is necessary to examine the specific provisions of the Sales Act to determine if bank-operated revolving credit card plans are encompassed within its scope. (See discussion at 10-16 infra).
 
 
 40
 B. Statutory Analysis of the Sales Act.
 
 
 41
 Plaintiffs argue that the definitional sections of the Sales Act exclude Master Charge and BankAmericard plans. Section 1201(5) of the Sales Act defines a "retail installment sale" as "... the sale of goods or the furnishing of services by a retail seller to a retail buyer for a time sale price payable in installments." (emphasis added). Plaintiffs contend that a Master Charge or BankAmericard transaction does not involve an "installment sale." In plaintiffs' view, there is no "time sale price" involved in Master Charge and BankAmericard purchases.
 
 
 42
 The difficulty with plaintiffs' argument in this regard is twofold. (1) § 1201(9) of the Sales Act defines "time sale price" as "... the total of the cash price of the goods or services and the amounts, if any, included for insurance, official fees and service charge." (emphasis added). Thus, by its very definition, "time sale price" can mean the same as "cash sale price" if no additional charges are imposed at the time of purchase. A "cash sale price" payable in installments (without any additional charges) is precisely what is involved in a Master Charge or a BankAmericard transaction. (2) Plaintiffs' argument resting on the definition of "installment sale," fails to recognize that § 1103 of the Sales Act specifically includes a "revolving account" as one type of "contract within the Act."[13]
 
 
 43
 Plaintiffs also argue that bank operated credit card plans (whereby the bank establishes a revolving account directly with the customer) are not encompassed within the Sales Act's definition of "revolving accounts." They contend that the Sales Act's provisions only authorize "revolving accounts" set up by a retail seller, or by a "financing agency" on behalf of a retail seller. We do not read the definitional sections of the Sales Act as requiring or supporting such a limited view of the Act's scope. Section 1201(7) defines a "revolving account" as follows:
 
 
 44
 (7) "Retail installment account" or "installment account" or "revolving account" means an account established by an agreement pursuant to which the buyer promises to pay, in installments, to a retail seller or to a financing agency, his outstanding balance incurred in retail installment sales, whether or not a security interest in the goods sold is retained by the seller, and which provides for a service charge which is expressed as a percent of the periodic balances to accrue thereafter providing such charge is not capitalized or stated as a dollar amount in such agreement. (emphasis added).
 
 
 45
 Thus, by its express terms, the Act authorizes an account in which the buyer is obligated to make direct payments to a "financing agency." There is no suggestion in the Act that the validity of such an arrangement is limited to situations in which the "financing agency" is acting solely on behalf of the retail seller rather than as an independent operator of a credit card plan.[14]
 
 
 46
 Lastly (insofar as plaintiffs' "definitional" arguments are concerned), plaintiffs contend that, even if a bank acting independent of a retail merchant comes within Section 1201(7), defendant banks are not "financing agencies" within the Sales Act's definition of that term because they do not "purchase" retail installment accounts as required by Section 1201(16). Section 1201(16) defines "financing agency" as:
 
 
 47
 (16) "Financing agency" means a person engaged in this Commonwealth in whole or in part in the business of purchasing retail installment contracts, or installment accounts from one or more retail sellers. The term includes but is not limited to a bank, bank and trust company, private banker, or investment company. (emphasis added).
 
 
 48
 Plaintiffs claim that neither Provident nor PNB "purchase" installment contracts in their Master Charge and BankAmericard operations. Their argument can be summarized as follows: (1) the obligation to pay for purchases made with bank credit cards runs exclusively to the defendant banks and not to the merchant who makes the sale; (2) the merchant has no monetary interest in the sales slip executed by the buyer; (3) therefore, defendant banks do not "purchase" commercial paper from member merchants in Master Charge and BankAmericard transactions. When faced with the same argument below, the district court refusing to limit its inquiry to the definitional portion of the statute, examined Article IX of the Act (dealing with Retail Installment Accounts) and specifically focused on the "purchase or acquire" language of § 1901 (see note 14, supra). That section provides, among other things, that the "financing agency" may "purchase or acquire indebtedness." The court concluded:
 
 
 49
 "... Even if it might successfully be argued that Provident and PNB do not 'purchase' the indebtedness, it certainly can be decided that they at least 'acquire' the cardholder's indebtedness from the retail seller."
 
 
 50
 373 F.Supp. at 65. We agree with the district court and, therefore, find it unnecessary to address ourselves to the question of whether defendant banks do, in fact, "purchase" installment accounts in the course of their Master Charge and BankAmericard operations.[15] Thus, we conclude that the defendants come within the definition of a "financing agency" (§ 1201(16)), that has established a "revolving account" (§ 1201(7)), through which defendants "acquire indebtedness" (§ 1901) arising from a "retail installment sale" (§ 1201(5)); thereby, satisfying the definitional requirements of the Sales Act.
 
 C. Legislative History
 
 51
 Plaintiffs next contend that the legislative history of the Sales Act supports their view that the Act was not intended to encompass bank operated revolving credit card plans. They claim that prior to the passage of the Sales Act, Pennsylvania merchants were exempt under the "time-price" doctrine from the State's general usury laws. They then refer to the debates preceding passage of the Sales Act which evidenced that a major purpose of the legislation was to place a limit on the interest merchants could charge. Plaintiffs claim that it would be incongruous for an Act, designed to limit interest charges by merchants, to increase, at the very same time, the rate of interest which banks could charge on revolving credit card plans (formerly limited to 12% by the Bank Code of 1965). In support of this argument, plaintiffs cite the remarks of Representative J. F. Clarke to the effect that Pennsylvania banks were then making a substantial profit under the twelve percent (12%) interest rate authorized under the Banking Code.
 
 
 52
 Mr. J. F. Clarke. In reply to merely one point, Mr. Speaker, I would like to state briefly my belief again that the one percent per month on the unpaid balance limitation on the credit service charge is adequate. Retailers say that they need 18 percent a year in order to compensate them for handling these accounts. There is a new system proposed by the banks in Pittsburgh-in fact it is in practice and has been working for some months-in which the banks issue credit cards upon application and finance purchases for the holders of these credit cards ....
 
 
 53
 Now, Mr. Speaker, if the banks-and there are large banks in the city of Pittsburgh-find this business so profitable at the rate of one percent per month from the unpaid balance to go out and seek it as avidly as they have been doing lately-and in many cases, I have been told, that they even send these credit cards unsolicited to persons-surely these large major retail stores and any other retail merchants can operate on the same basis and cover themselves with a one percent credit service charge.
 
 
 54
 Pennsylvania Legislative Journal-House (Special Session No. 1 of 1966, June 27, at 72). See also remarks of Representative Schmitt, Id. at 72-73.
 
 
 55
 After reviewing the legislature history of the Sales Act, we are not persuaded that the references by Representatives Clarke and Schmitt to the rates of interest charged on bank-operated revolving credit card plans indicate a legislative intent to limit banks to the twelve percent (12%) rate if merchants should ultimately be permitted to charge a higher rate. The remarks of Representatives Clarke and Schmitt must be read in the context of the dispute between the House and the Senate in Pennsylvania as to the maximum rate which should be authorized by the Sales Act. In referring to the twelve percent rate then being charged by Pittsburgh banks, Representatives Clarke and Schmitt were apparently speaking for those legislators advocating a twelve percent (12%) maximum interest rate under the Sales Act. It was in this form (12%) that the Sales Act was passed by the House of Representatives. Subsequently, however, the Pennsylvania Senate refused to approve a twelve percent (12%) rate. The final compromise reached between the House and Senate provided for a fifteen percent (15%) rate.[16] Our reading of the legislative history leads us to conclude that the Pennsylvania legislature intended the fifteen percent (15%) rate of the Sales Act to apply to both retail sellers and financing agencies (including banks) that met the statutory definitions, discussed supra. While the amount of the maximum rate was strongly disputed, we do not believe that the Pennsylvania Legislature ever intended to distinguish, as to maximum permissible interest rates, between bank-operated and non-bank-operated credit card plan.
 
 
 56
 Our interpretation of the legislative history of the Sales Act is buttressed by the fact that the Pennsylvania Legislature was aware that merchants did not finance their credit plans by themselves but rather sold their commercial paper to banks. Section 1904 of the Sales Act (see p. 7 supra) specifically allows the "seller or holder of a retail installment account" to charge the one and one-quarter per cent (11/4) per month rate. Section 1201(13) defines the "holder" of a retail installment account to include a "financing agency" which purchases the installment account.[17] If the Sales Act authorizes a bank to charge a fifteen percent (15%) rate when it purchases[18] "indebtedness" from merchants, we see no logical reason to construe the Act as precluding the same interest charge when the bank "acquires" indebtedness from merchants.
 
 
 57
 After reviewing plaintiffs' arguments that the twelve percent (12%) rate of the Bank Code, rather than the fifteen percent (15%) rate of the Sales Act, fixes the maximum interest that defendants can charge on their Master Charge and BankAmericard plans, we hold that defendants are authorized to charge up to fifteen percent (15%) per year as provided by the Sales Act.[19]
 
 
 58
 III. "INTEREST-ON-INTEREST"
 
 
 59
 Plaintiffs contend that Pennsylvania, as evidenced by a long line of cases,[20] disfavors compound interest[21] and allows its imposition only where there is an express statutory authorization or a specific contract provision so providing. Plaintiffs argue that there is no statutory authorization in the Sales Act nor a contract provision permitting defendants to charge "interest-on-(overdue) interest." We agree. The Pennsylvania Supreme Court in Powell, supra note 20, stated:
 
 
 60
 ... It is fairly well established that the law in this Commonwealth frowns upon compound interest and as such will only permit compound interest on a debt when the parties have provided for it by agreement or a statute expressly authorizes it...
 
 
 61
 246 A.2d at 115. Being bound by the law of Pennsylvania, we cannot approve the district court's reasoning that compounding is permitted because the Act does not expressly prohibit it.[22] Pennsylvania requires not an absence of expression but rather the presence of an express, affirmative statement in the Act approving the charging of compound interest before "interest-on-interest" may be allowed. (See cases cited in note 20 supra). No such expression is found in the Sales Act. To the contrary, § 1905 of the Sales Act (which sets forth the required disclosures to be made to a buyer) provides:
 
 
 62
 "The ... holder of a retail installment account shall promptly provide the buyer with a (monthly) statement ... setting forth the following:
 
 
 63
 (d) The amount of the service charge, and the following statement: The service charge herein contained does not exceed the equivalent of fifteen percent (15%) simple interest per annum on the unpaid balance except that a minimum service charge of seventy cents (70cents) per month may be made.
 
 
 64
 Thus, far from specifically approving the compounding of interest, the Sales Act mandates that no more than fifteen percent (15%) "simple interest" be charged.
 
 
 65
 Nor do we read the provisions in the defendants' "Cardholder Agreements" as specific contractual provisions for the charging of compound interest. The "Provident/Master Charge Agreement" provides no more than: "... a Finance Charge will be added to the Master Charge Account 'purchases' balance. ..." The BankAmericard "Customer Payment Schedule" is even less explicit: "... The amount of the Finance Charge is determined by multiplying such balance by a periodic rate of 11/4% per month...." We are satisfied that neither of these "cardholder agreements" is sufficiently explicit to constitute a contract for the payment of compound interest.
 
 
 66
 Defendants have advanced various arguments in an effort to persuade us that § 1904 of the Sales Act, in permitting interest charges on "outstanding balances," in fact authorizes the compounding of interest. First, defendants refer to § 1905 which requires various disclosures in the "monthly statement." One such disclosure is the "total balance."
 
 
 67
 Defendants contend that the "total balance" (§ 1905(e)) is the sum of all charges and credits enumerated in the preceding subsections of § 1905 (i. e.-subsections (a) through (d)). One of the preceding subsections (§ 1905(d)) provides for an "interest" charge and defendants, therefore, urge (without objection by plaintiffs) that "total balance" includes an "interest" element. The significance of this argument is that the "total balance" at the end of one billing cycle becomes the beginning balance of the next cycle on which the new interest charge is computed. Thus, argue defendants, the Sales Act impliedly authorizes a billing procedure which includes built-in, compound interest. Defendants then claim that there is no difference between the term "outstanding balances from month to month," which term appears the term "total balance" in § 1905(e) and in § 1904. They argue that "total balance" (§ 1905(e)) constitutes the base upon which "interest" is to be calculated; and, that § 1904 merely sets the maximum rate of "interest" to be applied to that base. Thus, argue defendants, the term "outstanding balances from month to month" was intended to mean the same as "total balance," which includes "interest" as well as current and past due principal.
 
 
 68
 We reject this argument. Defendants' analysis would require us to hold that the legislature used two different terms ("total balance" in § 1905(e) and "outstanding balances" in § 1904) in two different sections of the statute to convey the same meaning.[23] It does not necessarily follow from the fact that the term "total balance" in § 1905(e) includes by definition an "interest" element that the term "outstanding balances" in § 1904 must similarly include that "interest" element. The purposes of the two sections are different. Section 1905 ("Monthly Statement") serves the purpose of informing the cardholder of the amount of his outstanding indebtedness each month. By contrast, the purpose of § 1904 is to regulate the maximum amount of interest which can be charged on revolving accounts. Thus, given the difference in purpose and language between §§ 1904 and 1905(e), we do not believe the legislature intended the two terms to be synonymous. Finally, we cannot ignore the expressed intent of the legislature as reflected in § 1905(d) that the interest charge to be disclosed may not exceed "... fifteen percent (15%) simple interest per annum on the unpaid balance...." (emphasis added). Had compound interest been contemplated or intended, it would have been illogical for the legislature to require disclosure in terms of "simple interest."
 
 
 69
 We are convinced that the defendants' analysis, predicated upon an interpretation of §§ 1904 and 1905 of the Sales Act, is not sufficiently persuasive to overcome Pennsylvania's strong policy against the compounding of interest. As we noted previously (see p. 16 supra), there must be evidence of an express, affirmative legislative intent before defendants are authorized to compound interest in connection with their revolving credit card accounts. We find no such intent expressed in the Sales Act.
 
 
 70
 Second, defendants have argued that the legislative history of the Sales Act indicates that the language of § 1904 (see p. 7 supra), "outstanding balances from month to month," reveals that the legislature contemplated the charging of interest on balances which include overdue interest from past billing cycles. In support of this argument, defendants refer to the changes made in various drafts of the proposed legislation which ultimately resulted in the present form of § 1904.
 
 
 71
 Printer's No. 24 (Pennsylvania's designation for legislative drafts) contains the text of House Bill No. 7 (see note 16 supra), embodying the version of the Sales Act as passed by the House on June 28, 1966. At that time, the predecessor provision of § 1904 (which now reads: "... The service charge shall not exceed ... (a) on the outstanding balance, one and one-quarter percent (11/4%) per month....") appeared as follows:
 
 
 72
 (1) The credit service charge shall be calculated at a rate not to exceed ONE PER CENT OF THE UNPAID PRINCIPAL MONTHLY BALANCE ON WHICH IT IS CALCULATED. (emphasis added).[24]
 
 
 73
 Printer's No. 32 is the first Senate Reprint of House Bill No. 7 and reveals, by "strike-outs" at 21-22, the total deletion of the House provision quoted above. Printer's No. 32 substituted a new provision governing maximum permissible interest charger, which, except as to the rates proposed (the Senate version authorized a variable interest rate of one and one-half percent (11/4%), resembles the present version of § 1904 in its use of the term "outstanding balances."
 
 
 74
 ... The service charge shall not exceed the following rates computed on the outstanding balances from month to month.[25]
 
 
 75
 The Senate's language, "outstanding balances from month to month," survived to appear as the final version of the Sales Act, 69 P.S. § 1904.[26] In light of the revisions in the various drafts of the Sales Act, defendants argue that the House decided to limit the base upon which service charges (interest) could be imposed to the "unpaid principal monthly balance"; but, that such a limitation was specifically rejected by the Senate. Since the final version of the Sales Act embodies the Senate's language ("outstanding balances"), defendants reason that the House must have acquiesced in the Senate's decision to expand the base on which interest is charged to permit interest on "outstanding balances" (i. e. principal and interest).
 
 
 76
 The term "outstanding balances" as it now appears in the Sales Act (and as it appeared in the Senate draft (Printer's No. 32) and in the report of the Conference Committee (Printer's No. 34)) is without definition. We cannot tell with certainty whether the term "outstanding balances" includes or excludes "interest"; in this respect, its meaning is obscure and equivocal. There is no clear legislative intent inherent in the use of the term "outstanding balances" to indicate authorization for the charging of interest on "balances" which would include past due interest from previous billing cycles. Pennsylvania's strong policy against charging compound interest, in our opinion, requires an Unequivocal and affirmative statutory authorization before permission to charge compound interest would be justified. Although defendants have referred to various provisions in the House and Senate drafts of the Sales Act, they have failed to show us a pattern of revisions which unequivocally demonstrates an intent to permit the charging of "interest-on-interest." Indeed defendants have not and, and we believe, cannot reconcile their various arguments (that § 1904 of the Sales Act authorizes the charging of compound interest) with the express requirement in § 1905(d) that disclosure be in terms of "simple interest". Thus, we hold that the Sales Act, lacking an express, affirmative expression of legislative intent to permit compound interest, does not authorize the charging of compound interest on defendants' revolving credit card accounts.
 
 
 77
 Finally, defendants claim that, despite charging compound interest, the effective rate of interest charged on Master Charge and BankAmericard accounts was never in excess of fifteen percent (15%) "simple" interest per year.[27] We cannot agree with defendants that there is no statutory violation in the unauthorized charging of compound interest merely because the actual amounts charged do not exceed fifteen percent (15%) "simple" interest. If, as we hold, compound interest is not permitted under the Sales Act, it does not matter that the effective rate of compound interest results in interest charges within the permitted "simple" interest rate. In Citizens National Bank v. Donnell, 195 U.S. 369, 374, 25 S.Ct. 49, 49 L.Ed. 238 (1904), the Supreme Court dealt with an argument similar to that raised by defendants here.
 
 
 78
 ... The rate of interest which a man receives is greater when he is allowed to compound than when he is not, the other elements in the case being the same. Even if the compounded interest is less than might be charged directly without compounding, a statute may forbid enlarging the rate in that way....
 
 
 79
 In our view, Pennsylvania law "forbid(s) enlarging the rate" of interest by compounding and the Sales Act makes no specific exception to this general rule in the case of revolving credit card accounts. Accordingly, we hold that the Sales Act is violated by compounding interest regardless of the effective rate charged.
 
 IV.
 
 80
 Although summary judgment was sought by the defendants on all six counts of plaintiffs' complaint, appeal from the order of the district court was taken only from the grant of summary judgment on Count One (excessive interest charges) and Count Four (compounding of interest). For the reasons we have stated, we will affirm so much of the district court's Order of February 27, 1974 as granted summary judgment in favor of defendants on Count One. As to the grant of summary judgment in favor of defendants on Count Four, we will reverse and remand to the district court for additional proceedings consistent with this opinion.[28]
 
 
 81
 Each party will bear its own costs.
 
 
 
 [1]
 Master Charge, BankAmericard
 
 
 [2]
 The parties entered into a Stipulation of Facts describing, in large part, the operation of the Master Charge and BankAmericard revolving charge plans. In its opinion below, the district court ably summarized the stipulated facts, 373 F.Supp. 56 (E.D.Pa.1974). Our discussion in this section draws heavily on the district court's factual statement, with such deletions and amplifacations as we believe are required by the more limited nature of this appeal
 
 
 [3]
 If the cardholder disputes the sale, quality or delivery of merchandise covered by the sales slip, Provident or PNB may collect from or charge back the sale to the member merchant
 
 
 [4]
 As indicated in the text, the "outstanding balance" may include unpaid finance charges from previous billing cycles on which interest is thereafter imposed
 
 
 [5]
 The Stipulation of Facts reveals that the total number of Master Charge cardholders during the period November 1970 through November 1972 exceeded 100,000. The total number of BankAmericard cardholders in November 1972 approximated 280,000. The district court took no action with respect to certifying a class because of its summary judgment disposition
 
 
 [6]
 Neither party asserts that there is a genuine issue or dispute as to any material fact
 
 
 [7]
 The plaintiffs did not object to the grant of summary judgment as to counts 2, 3 and 5. (App. at 282, Tr. at 56; see Stipulation of Fact # 31)
 
 
 [8]
 We agree with the well-reasoned opinion of the district court (373 F.Supp. at 61-63) that jurisdiction is properly founded on 28 U.S.C. § 1337 ("... district courts shall have original jurisdiction of any civil action .. arising under any Act of Congress regulating commerce...."). We therefore, need not decide whether jurisdiction would also lie under 28 U.S.C. § 1355 ("... original jurisdiction, exclusive of the courts of the States, of any action ... for the recovery ... of any ... penalty ... incurred under any Act of Congress."). See First National Bank of Charlotte v. Morgan, 132 U.S. 141, 144, 10 S.Ct. 37, 33 L.Ed. 282 (1889)("A suit against a national bank to recover back twice the amount of interest illegally taken by it is a suit to recover a penalty incurred under a law of the United States....")
 
 
 [9]
 Among other things, plaintiffs seek injunctive relief and damages under 12 U.S.C. § 86, which authorizes recovery of "twice the amount" of the excessive interest paid
 
 
 [10]
 12 U.S.C. § 85 provides:
 Rate of interest on loans, discounts and purchases
 Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter.
 
 
 [11]
 See generally, B. Clark & A. Squillante, The Law of Bank Deposits, Collections and Credit Cards 185-208 (1970); Brandel & Leonard, Bank Charge Cards: New Cash or New Credit, 69 Mich.L.Rev. 1033 (1971); Davenport, Bank Credit Cards and the Uniform Commercial Code, 85 Banking L. J. 941 (1968); Hale, Holder in Due Course and Bank Cards, 5 U.S.C.L.J. 164 (1969); Note, Waiver of Defense Clauses in Three Party Consumer Credit Card Transactions, 11 B.C.Ind. & Com.L.Rev. 991 (1970); Note, Bank Credit Cards: The Service Charge Problem, 77 Dick.L.Rev. 991 (1970); Note, Bank Credit Cards and the Usury Laws, 4 U.Cal.L.Rev. (Davis) 335 (1971); Note, Interest Incognito-Usury Statute Applied to Revolving Charge Account Agreement, 34 U.Pitt.L.Rev. 54 (1972) for discussion of various "loan aspects" of revolving credit card transactions
 
 
 [12]
 Section 819-1001(A)(4) was expanded by § 309 of the Banking Code of 1965 to permit an interest charge of 1% per month on a "revolving credit plan."
 12A We note that defendant banks charged a maximum of twelve percent (12%) per year on "cash advances" obtained by the use of Master Charge or BankAmericard. Moreover, Stipulated Facts Nos. 7 & 8 reveal that plaintiffs used their credit cards only for the purchase of goods and services. Thus, we are not presented with an issue or a case in which direct loans were made to cardholders on Master Charge and BankAmericard accounts other than in a "retail purchase" context.
 
 
 [13]
 § 1103. Contracts within Act
 For the purposes of this act a retail installment contract, contract, retail installment account, installment account, or revolving account is made in Pennsylvania and, therefore, subject to the provisions of this act if either the seller to a resident buyer in Pennsylvania or if such resident Pennsylvania buyer accepts or makes the offer in Pennsylvania to buy, regardless of the situs of the contract as specified therein. (emphasis added).
 
 
 [14]
 Plaintiffs point to § 1901 of the Sales Act in support of their argument that a "financing agency" can establish a "retail installment account" only as the agent of a retail seller. Section 1901 provides in relevant part:
 "... a retail installment account may be established by a financing agency on behalf of one or more sellers from whom the financing agency may, with the buyer's consent purchase or acquire indebtedness of the buyer to be paid in accordance with the agreement." (emphasis added).
 We do not construe the permissive language of § 1901 as precluding banks from initiating their own credit card plans and independently qualifying as "financing agencies" within the meaning of § 1201(16). See discussion at 12 infra.
 
 
 [15]
 Defendants strenuously argue that they do purchase the indebtedness from the retail merchant. The substance of the banks' argument is that while "... (T)he buyer is indebted the instant he makes the credit purchase, ... the bank does not ... become his creditor until it has received the evidence of his indebtedness and paid the merchant for the indebtedness by crediting his account at the bank...." (Brief for Appellees at 18, n.7). The banks view such "crediting" as the equivalent of "purchasing."
 It is noteworthy that both the Master Charge and the BankAmericard Merchant Agreements use language indicative of a "purchase" of indebtedness. The "Provident/Master Charge Plan Merchant Agreement" requires the merchant to "... Assign all sales slips by delivery to Provident." The "BankAmericard Merchant Agreement" calls for the "... Purchase of Sales Drafts by Bank." (emphasis added).
 
 
 [16]
 See Pa. House Bill No. 7, Special Sess. of 1966, Printer's No. 24 at 30 (authorizing one percent per month); Pa. Senate Reprint of House Bill No. 7, Special Sess. of 1966, Printer's No. 32, at 50 (a variable one and one half percent per month); Conf. Comm. Rpt. on House Bill No. 7, Special Sess. of 1966, Printer's No. 34, at 21 (authorizing one and one-quarter percent per month)
 
 
 [17]
 Section 1201(13) provides:
 "Holder" means the retail seller who acquires a retail installment contract or installment account executed, incurred or entered into by a retail buyer, or if the contract or installment account is purchased by a financing agency or other assignee, the financing agency or other assignee. The term does not include the pledgee of or the holder of a security interest in an aggregate number of such contracts or installment accounts to secure a bona fide loan thereon.
 
 
 [18]
 Plaintiffs have not contested the banks' right to charge fifteen percent (15%) interest when the documents of indebtedness are, in fact, purchased from the retail merchant. Plaintiffs' argument in the present case is that Master Charge and BankAmericard transactions do not involve such "purchases."
 
 
 [19]
 This disposition makes it unnecessary for us to deal with defendants' argument that, even if state banks (operating their own revolving credit card plans) are excluded from charging 15% interest under the Sales Act, national banks can nevertheless charge the same rate allowed to merchants. See Tiffany v. National Bank of Missouri, 85 U.S. 409, 21 L.Ed. 862 (1873); but cf. 12 C.F.R. § 7.7310
 
 
 [20]
 Powell v. Retirement Bd., 431 Pa. 396, 246 A.2d 110 (1968); Murray v. Prudential Insurance Co. of America, 144 Pa.Super. 178, 18 A.2d 820 (1941); Stokely v. Thompson, 34 Pa. 210 (1859); Sparks v. Garrigues, 1 Binn. 151 (Pa. 1805)
 
 
 [21]
 "Compound interest" is defined as follows:
 Interest upon interest, i. e. when the interest of a sum of money is added to the principal, and then bears interest which thus becomes a sort of secondary principal...." (citations omitted).
 Black's Law Dictionary 358 (4th ed. 1957).
 
 
 [22]
 The district court found it "... significant that there is no express language in the Goods and Services Installment Sales Act prohibiting the compounding of interest. ..." 373 F.Supp. at 66
 
 
 [23]
 But see Novicki v. O'Mara, 280 Pa. 411, 124 A. 672, 673 (1924)("A change of language in separate provisions of a statute is prima facie evidence of a change of intent.")
 
 
 [24]
 Pa. House Bill No. 7, Special Sess. of 1966, Printer's No. 24, § 503 at 30
 
 
 [25]
 Pa. House Bill No. 7, Special Sess. of 1966, Printer's No. 32, § 904, at 50
 
 
 [26]
 As indicated, supra, note 16, the maximum permissible rate of interest was eventually compromised at fifteen percent (15%) per annum
 
 
 [27]
 Plaintiffs' counsel stipulated that defendants were not charging interest in excess of fifteen percent (15%) per year. (See App. at 283)
 
 
 [28]
 Plaintiffs' brief did not explicitly raise any issue concerning the district court's disposition of plaintiffs' motion for class certification. A motion to remand to the district court (predicated upon the district court's failure to act on plaintiffs' class certification motion), and correspondence relating thereto, were addressed to this Court. In light of our disposition and our remand, we leave this issue for the district court's determination if and when raised or renewed. We express no opinion regarding the merits of the class certification issue or any action which the district court may take in respect to any such motion