**In re Jerome JORDAN, Debtor.**

**Bankruptcy No. 87–04533S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 25, 1988.

Supplemental Opinion Sur Motion for Reconsideration Oct. 31, 1988.

As Modified Oct. 31, 1988.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Timothy P. Booker, Philadelphia, Pa., for debtor.

Arthur J. Matasow, Edwin Seave, Philadelphia, Pa., for Mid–Penn.

Hugh A. Benson, Chief Counsel, Dept. of Banking, Harrisburg, Pa., for Pa. Dept. of Banking.

Alan C. Gershenson, Philadelphia, Pa., for Pa. Financial Services Ass'n.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

We herein consider certain Objections raised by JEROME JORDAN, a Chapter 13

Debtor (hereinafter "the Debtor"), to a Proof of Claim filed by a party holding a second mortgage on his residential realty, Mid–Penn Consumer Discount Company (hereinafter "the Claimant"). The principal contest is over entries on an Amended Proof of Claim for pre-petition "late charges" and post-petition "additional late charges," the latter of which the Claimant contends are chargeable to provide it with the value of its claim upon the Debtor's deferral of payment to it in his Plan, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii).

We hold that the Claimant has not met its burden of establishing the legitimacy of its pre-petition late charges, especially since the Claimant appears to be arguing that it may compound such charges. We further hold that, under no circumstances, is the Claimant justified in imposing claimed post-petition late charges.

The Debtor filed the instance Chapter 13 bankruptcy case on September 11, 1987. A Plan, calling for payments of $200.00 monthly for thirty-six (36) months was filed with the Petition. This Plan would generate total payments of $7,200.00. The Claimant filed its initial secured Proof of Claim, on October 2, 1987, reciting "[t]he sum of $7,209.39 to be paid inside of Plan. The sum of $1,820.00 to be paid directly to Mid–Penn outside of Plan." The components of the $7,209.39 figure were set forth as follows:

| | |
|---|---|
| Principal Amount | $2,860.00 |
| Late Charges | 486.06 |
| Additional Late Charges | 2,308.78 |
| Charges Due | 1,554.55 |
| TOTAL | $7,209.39 |

On October 22, 1987, the Claimant also filed its *de rigueur* Objection to confirmation of the Debtor's Plan, contending that, as per his Plan, the Debtor was not remitting post-petition payments. *See In re Ford,* 84 B.R. 40, 41 (Bankr.E.D.Pa.1988). In fact, the instant Plan recites nothing concerning remittance of post-petition payments to the Claimant, although this may have been the Debtor's implicit intention.

However, the Debtor's initial difficulties were not with the Claimant, but concerned his first mortgagee, Atlantic Financial Federal (hereinafter referred to as "AFF"), which filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d) when he made no post-petition remittances to it. AFF ultimately filed a secured claim in the amount of $7,029.61 for arrearages only and the Debtor managed to iron out his difficulties with AFF by apparently catching up on all post-petition payments, which he was making outside of the Plan.

Unfortunately, remitting payments to AFF resulted in the Debtor's inability to pay either the Claimant or the Trustee. Also, his Plan, generating but $7,200.00 in total payments, was clearly insufficient to fund both the claim of $7,029.61 of AFF and the claim of over $7,200.00 filed by the Claimant. Therefore, the Debtor's Plan could not be confirmed at its first listed Confirmation Hearing on February 25, 1988.

By the date of the second listed Confirmation Hearing on April 7, 1988, the Standing Chapter 13 Trustee had filed a motion to dismiss the Debtor's case on the ground that the Debtor's Plan was infeasible, and that payments were not being made, even according to the Plan.

Since the case appeared to have serious problems which must be resolved immediately if the case was to survive and result in a confirmed Plan, we ordered the Debtor, on April 7, 1988, to file an Amended Plan and either make payments, file a motion to abate payments, and/or file an Objection to the Claimant's Proof of Claim on or before April 15, 1988, and we rescheduled hearings on Confirmation, the Trustee's motion to dismiss, and any Objections which were in fact filed on May 19, 1988.

By May 19, 1988, the Debtor had resolved the payment delinquency, and he sought to file an Amended Plan calling for payments of $125.00 monthly for sixty (60) months. However, clearly this Amended Plan was insufficient to resolve the feasibility problem in light of the presence of AFF's claim and the Claimant's claim, since it would generate total payments of only $7,500.00. Therefore, On May 19, 1988, we entered a further Order directing the Debtor to file a further Amended Plan and/or

Objections to the Claimant's claim on or before May 27, 1988, or suffer dismissal of the case at the next scheduled Confirmation Hearing date, on June 7, 1988.

On May 31, 1988, the Debtor belatedly filed the instant Objections to Claimant's Proof of Claim. Although these were to also be heard on June 7, 1988, the late filing of the Objection caused the Clerk's Office to schedule same on July 5, 1988. On June 7, 1988, we agreed to a final relisting of the Confirmation Hearing and the Trustee's Motion to dismiss on that date.

In the Objections, the Debtor contended that the claim "contains illegal interests [sic] and usurious interests" [sic] and "erroneous and exorbitant late charges" which resulted in a claim for "an outrageous figure and not legal or lawful by any means." The Claimant responded with an Answer defending its claim but, later, on July 1, 1988, implicitly admitting its partial merit, filed an Amended Claim which reduced its component of "additional late charges" claimed to $1,310.17, dropping its total claim to $6,210.78.

At the July 5, 1988, scheduled hearing, the Debtor expressed a desire to contest the claim, even as amended. He and Frederick Robinson, the Claimant's Vice–President, testified at the hearing of July 5, 1988, on this matter.

It was established at this hearing that, on November 14, 1985, the Debtor had made a loan from the Claimant in which he received net proceeds of $3,022.07. However, with added costs for life and disability insurance and a fee to record a mortgage taken upon his home in the transaction, and the addition of pre-computed finance charges for allowing repayment at $130.00 monthly over three years at an annual percentage rate of 25.4 percent, the total payments, through November, came to $4,680.00. The following clause in the contract pertained to "late charges:"

LATE CHARGES AND DEFERMENT CHARGES: If any payment is 10 or more days past due a late charge of 1½% per month of the amount that is past due may be collected provided however a minimum charge of $1.00 may be collected per defaulted payment. If payment is deferred a deferment charge of 1½% per month of the amount deferred for the period of the deferment may be collected. Nothing contained herein shall in any way be deemed to authorize the Debtor(s) to make any payment other than on the due date thereof or defer any payment beyond such due date.

The Debtor conceded that he never made any payments on this loan. He attributed this to the fact that he was not working over this period due, in large part, to a severe arthritic condition that rendered him physically disabled as of February or March, 1986. Unfortunately, the Debtor admittedly failed to notify the Creditor of this until over a year later in spring of 1988. Therefore, although the disability insurer on the loan should have been making the payments since early 1986, in fact it had only begun to do so as of a much later date. Since these payments would now be made directly to the Claimant by the insurer, the parties agreed that they should be designated as payments "outside the Plan."

Upon hearing the Debtor's testimony and recognizing that some considerable indebtedness was owed to the claimant, as well as to AFF, we did some rough calculations as to what the Debtor would have to remit to render the Plan potentially feasible. We stated that we believed the sum necessary to be paid to the Trustee in a 60–month Plan would be close to $250.00 monthly. We asked the Debtor if he could pay this much. With some reluctance, he answered affirmatively.

Mr. Robinson, identifying himself as the custodian of the Claimant's records, then took the stand. He stated that the "Principal Amount" of the Proof of Claim reflected twenty-two (22) payment due prepetition ($130.00 × 22 = $2,860.00). He explained that the "additional late charges" had been computed by determining the balance due as of November, 1988, when the loan expired, and adding the late charge of 1½% per month on each month through the termination of the Plan in September, 1992, when he projected that the loan would be

paid off. The precise calculations were not tendered. The reduction of the "additional late charge" computation from $2,308.78 to $1,310.17 was attributed to an unexplained error in the original calculations. Support for the procedure of calculation utilized was garnered from an exchange of correspondence of July, 1987, between Edwin Seave of the Claimant and F.A. George, Director of the Consumer Credit Bureau of the Pennsylvania Department of Banking in which Mr. George stated that "it is our opinion that at the expiration date of the contract— ... the entire balance due is delinquent and, therefore, subject to the 1½% per month charge to continue until the final amount is paid."

Copious documentation of the "charges due" was supplied, in the form of a computer print-out of the account history and copies of actual receipts of charges. These charges were incurred in two separate collection lawsuits against the Debtor which proceeded to judgments and consequent execution sales before being halted by the present and a previous bankruptcy filing, respectively. We note that the sum of the receipts is $1,649.50, but that only $1,554.55 is claimed for this entry by the Claimant.

No calculation of the amount of $486.06 for "late charges" was proffered. In a colloquy with the court, Mr. Robinson made it clear that late charges were not merely computed as a one-time charge when a payment was late each month, but that 1½% per month was assessed on the entire balance due in that month in making the calculations.

At the close of the hearing, counsel for the Claimant expressed an interest in defending particularly its assessment of "additional late charges." We therefore entered yet another Order of July 6, 1988, allowing the Debtor to file another Plan which had a greater probability of feasibility than its predecessors; allowing the Claimant and the Debtor until August 1, 1988, and August 15, 1988, respectively, to file Briefs supporting their positions; and rescheduled the Confirmation Hearing and the Trustee's Motion to Dismiss on September 1, 1988. Undoubtedly taking his cue from our colloquy with the Debtor at the July 5, 1988, hearing, the Debtor has filed an Amended Plan calling for payments of $250.00 monthly for sixty (60) months.

The beginning point of our legal analysis is our decision in *In re Lewis*, 80 B.R. 39, 41 (Bankr.E.D.Pa.1987), wherein we indicated our view of the appropriate allocation of the burden of proof in proof of claim litigation. Since both parties presented evidence at a contested hearing, the instant matter tracks Scenario 5 recited therein. The Debtor having produced some evidence tending to defeat certain components of the claim, the "bubble" of any presumption in favor of the Claimant was "burst," and the burden of proving all components of its claim by a preponderance of the evidence was thrust upon the Claimant.

The most vulnerable component of the Claimant's Proof of Claim is, as it anticipated, its entry for "additional late charges." The legal bases of the Claimant's demand for such charges is the contract clause recited at page 675 *supra;* the applicable state statute, the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "CDCA"), and particularly § 6213 K thereof; and the pertinent state regulation, 10 PA.CODE § 41.3(d). The latter two provisions read as follows:

7 P.S. § 6213 K:

In addition to the general powers conferred upon a corporation by the Business Corporation Law of this Commonwealth, a corporation licensed under this act shall have power and authority:

. . . . .

K. To collect an additional charge for extension, deferment or default in the payment of any contract or for extension, deferment or default in the payment of any installment on a contract at the rate of one and one-half percent (1½%) per month on the amount extended, deferred or in arrears. Provided, however, a minimum charge of one dollar ($1) may be col-

lected for any extension, deferment or default of ten (10) or more days.

10 PA.CODE § 41.3(d):

(d) The act requires that due notice of a licensee's intention to collect default charges be given to the consumer in the statement of contract. A licensee may, upon notice, collect a specified default charge on loan contracts at the rate permitted in the action on the amount in default. The minimum charge permitted in the act may be collected for a default of 10 or more days. No charge may be collected for default created by the deduction of default charges from prior installments. *After maturity of the loan contract, the entire unpaid balance is the amount in default.* No provision has been made permitting the full default charge to be collected for a fraction of a month when the loan contract is less than a month in default; therefore, it is necessary to calculate the default charge on the actual number of days from the due date of the payment in default to the date the payment is collected. Default charges may be accrued and collected at the time of final payment of a loan contract. Default charges accruing prior to periods of claims may be deducted from the proceeds of accident and health insurance claim payments; however, default charges may not accrue during periods of claims (emphasis added).

■ For purposes of this argument, we will assume, as the Claimant argues, that the language emphasized above supports the Claimant's imposition of these charges under state law, apart from consideration of the impact of the Bankruptcy Code. We will also assume *arguendo* that these charges were calculated correctly. Nevertheless, we must conclude that the Claimant's attempt to append "additional late charges" to its Proof of Claim in bankruptcy cannot be supported.

In a careless moment during the hearing of July 5, 1988, Mr. Robinson stated that the entry for "additional late charges" was the equivalent of a claim for "interest on arrears." We agree, and we believe that the decision in *In re Capps*, 836 F.2d 773 (3d Cir.1987), precludes this portion of the Claimant's Proof of Claim.

The Claimant argues, like the mortgagee in *Capps*, that 11 U.S.C. § 1325(a)(5)(B)(ii) "necessitates" payment to it for the loss of the use of its money during the period of time that it takes the Debtor to "cure" the payment delinquency to the Claimant through his Plan. *Id.* at 775. However, as the Court of Appeals points out in *Capps*, a "cure" of a default is *not* an impermissible modification of the interests of a secured creditor. *Id.* All that § 1325(a)(5)(B)(ii) does is "limit the effects of cramdown," *id.* at 776, by assuring that a creditor receives the present value of its claim. Thus, § 1325(a)(5)(B)(ii) merely provides that the deferral of a secured creditor's allowed claim will not be uncompensated. In no sense does it provide that the secured creditor will be guaranteed a return, upon deferral, which is enhanced by all of the additional charges that would be otherwise permissible under the parties' contract and/or state law.

The Claimant also misreads those cases where we have held that § 1325(a)(5)(B)(ii) does come into play, *e.g.*, *In re Mitchell*, 77 B.R. 524 (Bankr.E.D.Pa.1987) (hereinafter *"Mitchell II"*); *In re Mitchell*, 75 B.R. 593, 598–99 (Bankr.E.D.Pa.1987) (hereinafter *"Mitchell I"*); and *In re Crompton*, 73 B.R. 800, 806–07 (Bankr.E.D.Pa.1987) (hereinafter *"Crompton II"*). In those cases, we required the respective debtors, as a condition for presenting confirmable plans, to compensate their respective secured creditors for deferral of their claims. We did not hold that the deferral charge was added into or became part of the claim itself. *Compare Mitchell I*, 75 B.R. at 599, 600 (interest for deferral *added to* claim, not *made a part of* the claim); *Crompton II*, 73 B.R. at 806–07 (interest for deferral added to the amount of the claim already determined in *In re Crompton*, 68 B.R. 831 (Bankr.E.D.Pa.1987) (*"Crompton I"*), not *made a part of* the claim).

Moreover, as we emphasized in *Mitchell II*, the interest rate for effecting deferral of payment of a secured claim, pursuant to § 1325(a)(5)(B)(ii), is measured by the *lesser* of the contract rate *or the market rate of interest.* 77 B.R. at 527, 529. The "contract rate" of 1½% per month, or 18% per annum, is surely higher than the market rate.

The Claimant may, of course, object to confirmation of the Debtor's plan if the Plan fails to provide it with interest, at the market rate, for deferral of its secured claim under § 1325(a)(5)(B)(ii). However, it may not add the interest for deferral into its claim. Nor may it insist that the interest rate for deferral be as steep as the "contract rate" of 18% per annum.

■ We now address the pre-petition "late charge" component of the Claimant's claim. In this discussion, we express our doubt that the parties' contract and the applicable state law permits a computation of "late charges" as the Claimant would have it. We also express our firm conclusion that the Claimant has failed to establish, by the requisite preponderance of evidence, that it properly and legally computed either the pre-petition or the post-petition "late charges" recited in its Proof of Claim.

We have considered the subject of "late charges" in the past in three cases, *Gambale v. Lomas & Nettleton Co.,* 80 B.R. 308, 310 (E.D.Pa.1987); *In re Andrews,* 78 B.R. 78, 80–84 (Bankr.E.D.Pa.1987); and *In re Dangler,* 75 B.R. 931, 933–34 (Bankr.E.D.Pa.1987). In *Gambale* and *Dangler,* we addressed allegations that violations of the federal Truth-in-Lending Act, 15 U.S.C. § 1601 et seq. (hereinafter referred to as "TILA"), arose due to the failures of the respective mortgagees to designate, on the TILA disclosure statements given to the respective mortgagors, whether the late charge, measured by a percentage of four (4) percent per month, was computed by

reference to "the current monthly payment only or the entire accrued delinquency of all monthly payments then due." *Gambale, supra,* 80 B.R. at 310. The defense of the mortgagee in *Gambale* was that it was self-evident that a "late charge" would be computed by reference to the current monthly payment only. *Id.* Here, however, the Claimant seeks to calculate its "late charge" by reference to the entire accrued delinquency of all monthly payments.[1]

The Claimant obviously believes that its contract and the pertinent state law and regulation are clear in allowing it to compute the late charge by reference to the accrued delinquency of all monthly payments. We disagree. The pertinent contract clause, quoted at page 675 *supra,* allows 1½% *"per month* of the amount that is past due." It also states that the charge is imposed "per defaulted payment." The terms "per month" and "per defaulted payment," appearing, respectively, before and after the phrase "amount that is past due" may confine the meaning of the phrase "to the amount that is past due" to only the amount that is past due per one month or per one defaulted payment. At any rate, the phrase is ambiguous, and, as in a similar context in *Andrews, supra,* we note "that any ambiguities in a contract, particularly an adhesion contract in which there was no bargaining over terms, must be construed strictly against the party who drafted the contract." 78 B.R. at 81.

Irrespective of the applicable law, which is merely permissive in allowing a certain maximum sum of finance charges if the contract so provides, the Claimant cannot collect any particular "late charges" without express authorization to do so in the contract. Therefore, an ambiguity in the contract may be fatal to the Claimant's attempt to compound late charges on the entire balance in default.

---

1. Although the Claimant has not, as we indicate hereinafter at pages 679–81 *infra,* indicated precisely how it *did* calculate the purported "late charges" of $486.06, it is clear that this figure is more than if it were calculated at 1½% of the monthly payments of $130.00, which would result in "late charges" of no more than $1.95 per month and a maximum total of $70.20 even if all 36 payments were late.

Similarly, a contract clause allowing a certain computation of late charges will be unenforceable if it is contrary to that authorized by the applicable statute or regulation. Therefore, only if the contract and the statute and regulation are *all* unambiguous in allowing the Claimant to compound late charges would we be confident in allowing the Claimant to do so.

■ The applicable statute, 7 P.S. § 6213 K, quoted at pages 676–77 *supra,* is not clear on this point at all. It states that the maximum permissible "charge for ... default in the payment of any installment on a contract ... in arrears" is 1½% "per month." The use of the singular terms "charge," "installment," "payment" and "month" suggest that the maximum single *charge* for any late *installment* is 1½% of the *payment* due in a single *month.* Therefore, the use of the singular throughout suggests that the computation must be made by reference to the current monthly payment only.

The applicable regulation, 10 PA.CODE § 41.3(d), also quoted at page 677 *supra,* does little to assist in interpretation of this point. Reference is made to the right of a licensee under the CDCA to collect a late charge "on the amount in default." This phrase *could* apply to the default for only that month or the entire amount in default. The balance of the regulation's language does not address this latent ambiguity. Meanwhile, the regulation is very clear in providing that "[a]fter maturity of the loan contract, the entire balance is the amount in default." However, it is considerably less clear in defining what "the amount in default" is deemed to be *prior* to maturity of the loan contract.

The Claimant cites no Pennsylvania cases construing 7 P.S. § 6213 K or 10 PA.Code § 41.3(d) in the manner in which it does, and we could find none. Therefore, we are apparently dealing with a matter of first impression. The most closely analogous cases in which the issue of computation of late charges generally was raised was in our decisions in the *Gambale, Andrews,* and *Dangler* cases. There, the mortgagees consistently took the position that late charges could be computed only on the particular monthly payment which is late.

Several general principles in construction of contract clauses and laws regarding charges for interest or late payments to borrowers or consumers suggest that the Claimant's method of computing late charges is incorrect.

The first is the holding of *Haas v. Pittsburgh National Bank,* 526 F.2d 1083, 1094–95 (3d Cir.1975); and *Acker v. Provident National Bank,* 512 F.2d 729, 739–42 (3d Cir.1975), that compounding interest or charging "interest-on-interest" is contrary to Pennsylvania law. Both of these cases addressed the seemingly innocuous practices of certain well-respected, well-represented, and well-meaning financial institution in computing finance charges on the "outstanding balance" or the "previous balance" from the prior month in computing monthly finance charges imposed on revolving credit-card account balances. *Haas* echoed *Acker's* holding that compounding of interest was tolerated in Pennsylvania only when an "express, affirmative statement" in the law permitted it. 512 F.2d at 739. Both cases held that the Defendants' practices in issue there, be they ever so "reasonable," were illegal.

The Claimant's precise method of operation in computing late charges is unclear. That lack of clarity is a sufficient basis in itself for denying the late charges claimed due to it by the Claimant, on the ground that it has not met its burden of proving, by a preponderance of evidence, that the charges imposed were legitimate. *Compare Lewis,* 80 B.R. at 43 (mortgagee denied all late charges in Proof of Claim where it failed to show precise method of computation of such charges).

It is my no means certain that the Claimant has not illegally compounded late charges in making its calculations. It appears that the Claimant believes that it was entitled, under the CDCA provision and regulation quoted, to add late charges for the initial month that payments were late onto a total balance, and then to compute late charges for each succeeding month on the basis of a figure which included not

only all of the payments which were delinquent, a practice itself questionable, but onto a figure which included previously-accrued late charges as well as delinquent payment. This clearly would be compounding of late charges, a practice condemned in *Haas* and *Acker*. This is comparable to the method of computation which permitted the creditor in *In re Souders*, 75 B.R. 427, 437–38 (Bankr.E.D.Pa.1987), to parlay a $30,000.00 obligation into a claim of $147,-933.75. We submit that the pertinent law and regulation give no more express, affirmative approval to such a practice than did the state laws in issue in *Haas* and *Acker*.

Courts in several other American jurisdictions have utilized several legal grounds as bases for invalidating unconscionable late charges. *See* Annot., *Validity of Construction of Provision Imposing "Late Charge" or Similar Exaction for Delay in making Periodic Payment on Note, Mortgage, or Instalment Sale Contract*, 63 A.L.R.3d 50, 57–65 (1975).

One basis is that excessive late charges constitute imposition of additional interest charges and are hence usurious. *See, e.g., Bunn v. Weyerhauser Co.*, 268 Ark. 445, 598 S.W.2d 54, 56 (1980); *Wright Insurance Agency, Inc. v. Scott*, 371 So.2d 1207, 1208 (La.App.1979); *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167, 172–74 (1980); *Dixon v. Brooks*, 604 S.W.2d 330, 333–34 (Tex.Civ.App.1980); and Annot., *supra*, 63 A.L.R.3d at 61–64. We note that, in *Bunn*, the late charge imposed was precisely the same as that in issue here, 1½% per month.

Another basis is that such late charges are a purported liquidated damage clause which, being excessive in measuring the damage resulting to the creditor as a consequence of the consumer's late payment, constitutes an unenforceable penalty clause. *See Garrett v. Coast & Southern Federal Savings & Loan Ass'n*, 9 Cal.3d 731, 1202–03, 108 Cal.Rptr. 845, 850–51, 511 P.2d 1197 (1973); *Willoughby Real Estate Co. v. Sanders*, 109 Daily Wash.L.Rptr. 1149 (D.C.App.1981) (maximum enforceable late charge for a delinquent rental payment limited to a one-time charge equal to 5% of the monthly rent or $10.00 monthly, whichever is less); *Burstein v. Liberty Bell Village, Inc.*, 120 N.J.Super. 54, 57, 293 A.2d 238, 240 (1972); and Annot., *supra*, 63 A.L. R.3d 59–61.

This latter argument strikes a responsive chord in a vein of Pennsylvania cases holding that a contractual provision for liquidated damages "that calls for a payment of a sum on non-performance or on default that is disproportionate to the ... injury that has actually occurred will be deemed a penalty [and] ... 'will be voided....'" *Finkle v. Gulf & Western Mfg. Co.*, 744 F.2d 1015, 1021 (3d Cir.1984). *See also, e.g., In re Plywood Co. of Pa*, 425 F.2d 151, 155 (3d Cir.1970); *In re Oscar Nebel Co.*, 117 F.2d 326, 328 (3d Cir.1941); *Dorrance v. Lehigh Valley Coal Co.*, 13 F.Supp. 73, 76 (M.D.Pa.1936); *Unit Vending Corp. v. Tobin Enterprises*, 194 Pa.Super. 470, 473, 168 A.2d 750, 751 (1961); *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Comm'n*, 76 Pa.Cmwlth. 102, 127 n. 8, 464 A.2d 546, 558 n. 8 (1983); and RESTATEMENT (SECOND) OF CONTRACTS, § 356(a) (1981).[2]

We are certainly not prepared to conclude intuitively that the Claimant suffered $486.06 of additional losses as a result of the Debtor's failure to make his loan payments in timely fashion. Certainly, no proof of any such damages was placed upon the record here. It should be recalled that this particular lender was, by the terms of the parties' original contact, imposing interest charges at an annual percentage rate of over 25 percent per annum. See page 675 *supra*. It appears unconscionable to allow the Claimant to enhance this sum with late charges calculated by a

---

**2.** We also observe that the Federal Trade Commission has promulgated a regulation prohibiting "pyramiding" of late charges, i.e., imposing late charges attributable solely to prior imposition of late charges, at 16 C.F.R. § 444.4. The Commentary to Rule reveals a broad federal concern with late charge policy which duplicate penalties for late payments in prior months, as does the Claimant's computation method utilized here. *See* 49 Fed.Reg. 7770–72 (March 1, 1984).

method substantially more beneficial to it than the method utilized by other mortgagees, such as those in issue in *Gambale, Andrews,* and *Dangler,* who were collecting interest at an annual percentage rate of less than half as much.

There are, therefore, alternative policy reasons for construing the ambiguous provisions of the parties' contract and the applicable law against the Claimant, and limiting it to no more than a one-time 1½% surcharge on a late monthly payment, similar to the practices espoused by the mortgagees in *Gambale, Andrews,* and *Dangler.* While we cannot determine precisely how the Claimant made its calculations of late charges, we know that it charged more than the $70.20 maximum permissible additional charges under this method of calculation. See page 678 n. 1 *supra.*

In any event, as we explained at page 679 *supra,* since the Claimant has failed to meet its necessary burden of proof of totally justifying the late charges imposed upon the Claimant here by revealing its method of calculation of same, our decision in the *Lewis* case on analogous facts is controlling here. Therefore, the Claimant's entire itemized entry of $486.06 for "late charges," as well as its entire itemized entry of $1,310.17 for "additional late charges," will be stricken from its Amended Proof of Claim. The sum of these figures, $1,796.23, will therefore be deducted from the amount claimed of $6,210.78 in our calculation of the valid Proof of Claim to which the Claimant is entitled. We shall therefore reduce the Claimant's secured claim to the net amount of $4,404.55.

In his Brief, the Debtor contends that the "charges due," or costs, of $1,554.55 are excessive due to the fact that, in its calculation of same, the Claimant failed to give the Debtor credit for refunds deducted from the two sums of $650.00 deposited with the sheriff as deposits for the costs of conducting sheriff's sales, receipts for which were included among those submitted by Mr. Robinson. Furthermore, in a wild swing for a grand-slam home run, the Debtor closes his Brief by stating that, because of the Claimant's failure to include the refund, "we asked [sic] that the entired [sic] claim be dismissed on the grounds that it was filed in bad faith."

On this point, the Debtor confronts the same problem that the Claimant did on its request for pre-petition late charges, *i.e.,* there is a total lack of any substance in the record to support his contentions. The potential inaccuracy of the receipts produced by Mr. Robinson was never questioned at the hearing. On this point, the Claimant placed into the record documentation supporting a total sum of $1,649.50, surely ample to support a $1,554.55 amount for this entry on the Proof of Claim. We cannot assume that the sheriff would have or did issue a refund to the Claimant without evidence of same. The Debtor had ample opportunity to question Mr. Robinson on this point, but did not do so. Our speculation is not conclusive, but we note that it is conceivable that the difference between the receipts produced by Mr. Robinson and the amount claimed for such costs could reflect these refunds.

In any event, while overstating the sums due to it, we fail to find the Claimant to have acted in bad faith. Mr. Robinson's contentions appeared to have represented genuine convictions that he was correct in his requests for all of the entries on the Proof of Claim. The Claimant's post-hearing arguments in support thereof were plausible and delivered in, if anything, a more coherent and convincing fashion than the Debtor's counter-arguments.

However, we disagree with the contentions of the Claimant that the entries for "late charges" or "additional late charges" in its Proof of Claim are supported by this record, and therefore we will proceed to enter an Order reducing its secured claim to $4,404.55.

## SUPPLEMENTAL OPINION SUR MOTION FOR RECONSIDERATION

On August 31, 1988, subsequent to our Opinion and Order of August 25, 1988 (hereinafter referred to as "The Opinion" and "The Order", respectively) sustaining in part the Debtor's Objections to the Proof of Claim of Mid–Penn Consumer Discount

Company (hereinafter "the Claimant"), the Claimant filed a Motion seeking that we reconsider The Order and stay its enforcement. We addressed this Motion at the Debtor's confirmation hearing which, per The Order, was conducted on September 1, 1988. At that hearing, the Standing Chapter 13 Trustee recommended Confirmation of the Debtor's second Amended Plan in light of the disposition effected by the Order. The Claimant argued that we should re-open the record to allow testimony to be adduced from employees of the Pennsylvania Department of Banking (hereinafter "DOB"), who it contended would clear up the ambiguity which we found extant in 7 P.S. § 6213 K of the Pennsylvania Consumer Discount Company Act (hereinafter "CDCA") and the DOB's Regulation pertinent thereto at 10 PA.CODE § 41.3(d), in our discussion at pages 679–81 of The Opinion.

As we stated at that time and reiterated in our subsequent Order of September 2, 1988, granting the Claimant's Motion for Reconsideration in part, we were not willing to open the record to allow further testimony relative to the Objection to the Claim in issue. However, we were willing to give the parties, and any other parties who wished to do so in the capacity of *amici curiae*, an opportunity to address the issues of first impression which we discussed at pages 679–81 of The Opinion, *i.e.*, what late charges were permissible under 7 P.S. § 6213 K and 10 PA.CODE § 41.3(d). We believed that this was the proper means by which the DOB could properly recite its interpretation of the statute and Regulation in issue and reasons therefor, as opposed to providing testimony. We therefore allowed to the Claimant and any *amici* supporting its position until September 30, 1988, to file a Brief addressing the Motion for Reconsideration, and the Debtor and any parties supporting his position until October 17, 1988, to respond. We also stayed entry of an Order confirming the Plan until this supplemental briefing was completed.

As it developed, we received timely *amici* Briefs from the DOB and the Pennsylvania Financial Services Association (hereinafter "PFSA"). The Claimant requested and was granted an brief extension until October 5, 1988, to file its Brief. The Debtor filed a very short and not very helpful Reply Brief on October 20, 1988.

The *amici* properly confine themselves to the issue of first impression concerning which we indicated that we would be receptive to further briefing in our Order of September 2, 1988. The DOB, while citing no statutory or regulatory authority for its position, contends, simply, that its reading of the reference to "the amount ... in arrears" in 7 P.S. § 6213 K and "the amount in default" in 10 PA.CODE § 41.3(d), allows a licensee under the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter "CDCA") to assess a late charge on "the total amount past due or then in arrears," rather than the amount of each monthly payment. The PFSA states that "others will argue in depth why the court's construction is contrary to the clear and unambiguous language of the statute," a prediction which never comes to fruition. It then devotes the remainder of its Brief to two contentions: (1) We should defer to the DOB's interpretation of the pertinent statute and regulation; and (2) We should defer to the "uniform practice of the lending industry" of computing late charges pursuant to the CDCA by reference to the sums of payments in default rather than only the payment for a given month.

The Claimant submitted a lengthy Brief addressing numerous issues relative to the Objection in issue. A sizable portion is devoted to whether we properly applied our own prior decision in *In re Lewis*, 80 B.R. 39 (Bankr.E.D.Pa.1987), to the record at hand in concluding that the Claimant had the burden of vindicating the "late charge" component of its claim. The propriety of our striking the portion of the claim designated as "additional late charges" is briefly revisited. Tables setting forth four separate "late charge" calculations are included, including an admission that the $486.06 figure previously claimed was in error and should have been $458.82, and vigorously contending that it did not compound late

charges in its calculations, as we suggested it may have done at pages 679–80 of The Opinion. At the outset, two pages are even devoted to an argument that we never should have considered the Debtor's Objections to its Proof of Claim on its merits at all because the Debtor's counsel did not file and serve his previous pleadings punctually!

We believe that each of the parties submitting Briefs on the Claimant's behalf were laboring under some misconceptions. First, as to the Claimant, we thought our Order of September 2, 1988, and our statements in court on September 1, 1988, had made it clear that we were reconsidering only that portion of The Opinion relating to the proper means of computing late charges under 7 P.S. § 6213 K and 10 PA.CODE § 41.3(d). Thus, we envisioned briefing on this issue alone. Our Order of September 2, 1988, clearly stated that we were not receptive to supplementation of the record with additional evidence. Therefore, we will not consider the Claimant's Tables in the same light as if they had been presented as evidence at the hearing on July 5, 1988. We will consider them only, as they appear to have been presented, as illustrative of the computation process utilized by the Claimant under the CDCA.

The *amici* seem to have clearly grasped this point, as they address *only* the issue that we anticipated reconsidering, *i.e.*, the proper interpretation of 7 P.S. § 6213 K and 10 PA.CODE § 41.3(d). However, both express the somewhat mistaken impression that The Opinion definitively *held* that late charges could be computed, under those statutory and regulatory provisions in issue, only on the payment due for a particular month. To the contrary, in The Opinion, as illustrated by our statements at pages 678 and 680, we merely expressed our doubt that the assumption of the Claimant that it could compute the late charge on the entire balance due was correct.

In any event, we believe that our Order of September 2, 1988, indicated quite clearly that we did not intend to reconsider our holdings, in The Opinion, that the Claimant had the burden of proving, at the hearing of July 5, 1988, that its asserted late charge of $486.06 was accurate and that this burden was not sustained by it at that hearing. Moreover, even were we to do so, our decision on that score would be sustained.

Contrary to the claimant's contentions, the scenario presented here is not the first (no objection filed to proof of claim) nor the third (no evidence presented at the hearing on the Objection) of the five potential scenarios in which objections to proofs of claim come before us recited in *Lewis*, 80 B.R. at 39, 40. Rather, we were clearly presented with the fifth scenario (both parties presented testimony relative to the objection at the hearing). As we later reiterated in *In re Celona, Celona v. Equitable National Bank*, 90 B.R. 104, 108–09 (Bankr.E.D.Pa.1988), once an objector raises an objection to a claim and provides any evidence tending to dispute a claim, "the claimant will prevail only in the amount that it would be awarded at a trial or hearing, in which the burden of proving its case by a preponderance of evidence [is] upon the claimant." *Lewis, supra,* 80 B.R. at 41. We cited The Opinion in this case with approval in *Celona,* at 109. Any contention that the principles enunciated in The Opinion here were contrary to or reconsidered even in part in *Celona* is therefore misplaced.

As we previously pointed out in The Opinion, at page 679, the facts here were analogous to those of *Lewis* in numerous relevant respects. The debtor there presented testimony relating only to the mortgage payments she claimed to have made. 80 B.R. at 42. She made no reference to late charges, but merely claimed that she owed a figure which did not include such charges. The mortgagee, while successfully rebutting many of the debtor's contentions, "made no showing of how its claim for late charges was computed." *Id.* at 43. We declined to take judicial notice of "the potentially uncertain means by which such charges are computed," citing *In re Andrews,* 78 B.R. 78 (Bankr.E.D.Pa. 1987). 80 B.R. at 43. Consequently, all

late charges claimed by the mortgagee there were denied. *Id.* at 43, 44.

Practically, the burden of proving a claimant's right to late charges in its claim could scarcely be allocated otherwise. A debtor could hardly be expected to prove a negative, *i.e.*, to present evidence *disproving* the unknown reasoning and rationale of a claimant in contending that late charges which the debtor denies are justified are in fact due. The logic of allocation of the burden of proof is that it is necessarily placed on the party who has the most knowledge and best means of proof on a given issue at his disposal. *Compare In re New York City Shoes, Inc.*, 86 B.R. 420, 425 (Bankr.E.D.Pa.1988) (landlord has burden of proving his own diligent efforts to replace an errant tenant); *In re Crompton*, 73 B.R. 800, 808–09 (Bankr.E.D.Pa. 1987) (debtor has burden of proving that his own statement of income and expenses satisfies the requirement that all of his projected disposable income is being paid into a Chapter 13 plan); and *In re Furlow*, 70 B.R. 973, 978 (Bankr.E.D.Pa.1987) (debtor has burden of proving the logic of his reasons for discriminating in his treatment of creditors). Clearly, the party having the most knowledge of computation of the late charges in issue here and the party upon which the burden of proof must therefore be placed is the Claimant.

The only burden of the Debtor is to raise a particular issue in reference to a claim. We do not agree with the Claimant's contention that the Debtor failed to put the issue of the legitimacy of the Claimant's late charge on the table of issues raised in his Objections. *See* pages 674–75 of The Opinion. Imposition of all late charges was definitely an explicit bone of contention, as expressed in the Objections. We fail to understand what specific evidence the Debtor could have been expected to put on to rebut the legitimacy of a charge the imposition of which he disputed and the calculation of which were totally beyond his comprehension. We also disagree with the Claimant's further contention that its witness, Frederick Robinson, sufficiently explained the calculations of the late charges. Despite the court's *sua sponte*

efforts to assist the Claimant's cause by eliciting such testimony, we received only vague generalities in response from Mr. Robinson.

Furthermore, it is scarcely comforting to note that the Claimant now concedes that its previous calculation of $486.06 due in late charges, as opposed to its present calculation of $458.82 as the amount of late charges owed by the Debtor, was in error. Reminiscent of its previous concession of an over-statement in its calculations of "additional late charges" by almost $1,000.00, see pages 674 and 675 of The Opinion, this concession rebuts the notion that those calculations are characterized by mathematical certainty and precision.

By way of contrast, Mr. Robinson presented clear and copious documentation of the costs charged to the Claimant. Consequently, all Objections as to that component of the claim were rejected by us. See page 681 of The Opinion.

Similarly, we did not intend, in our Order of September 2, 1988, to reopen the issue of whether the Claimant could legitimately demand the component of its claim designated as "additional late charges" from the Debtor. The Claimant's comments on this score and its swipes at slightly-belated filings and alleged incompetency of the Debtor's counsel are misplaced. The court, in considering Objections to Proofs of Claim which jeopardize confirmation, cannot overlook the fact that interests of the Debtor's other creditors, none of which (nor the Trustee, their collective representative) objects to confirmation here, demand that legitimate objections raised to claims be decided on their merits rather than solely on the basis of the relative skill of opposing counsel.

We now address the sole issue concerning which we did contemplate be allowed reconsideration in our Order of September 2, 1988: how should late charges be properly computed under the CDCA?

We do not find the arguments of either the Claimant or the *amici* very persuasive on an intellectual level. Their recitations

do not cite to any judicial or administrative precedent. This observation reinforces our belief that this issue is truly a matter of first impression, and furthermore is one to which neither the legislature, the courts, or the regulating agency have given much critical consideration. None of the policy arguments which we recited in The Opinion points at pages 679–81 are rebutted by either the Claimant or the *amici, i.e.:* (1) Ambiguities in the law must be construed against allowance of additional charges; (2) Imposition of such substantial late charges such as are requested by the Claimant are in the nature of a penalty; and (3) The Claimant's method of calculation is much more generous to its interests than that regularly used by home-purchase mortgagees. *E.g., Gambale v. Lomas & Nettleton Co.,* 80 B.R. 308, 310 (E.D.Pa.1987); *Andrews, supra,* 78 B.R. at 80–84; and *In re Dangler,* 75 B.R. 931, 933–35 (Bankr.E.D. Pa.1987).

We have, moreover, become aware of possibly controlling decision of the Third Circuit Court of Appeals in *In re Tastyeast, Inc.,* 126 F.2d 879, 881–82 (3d Cir. 1942), which presents another line of reasoning supporting our actions of disallowing late charges to the Claimant. In that case, the Court of Appeals held that a bankruptcy court retains equitable power to disallow even non-usurious, contractually-agreed interest to a mortgagee when the amount sought is so disproportionate to the damages suffered by a mortgagee as a consequence of a default as to constitute a penalty for late payment. The Court also strongly states that the presence of inequality of bargaining power, which certainly appears to have been present here, is a factor in disallowance of such charges. *Id.* at 881. *Accord, In re White,* 88 B.R. 498, 510–11 (Bankr.D.Mass.1988); and *In re Rolfe,* 25 B.R. 89, 94 (Bankr.D.Mass. 1982), *aff'd,* 710 F.2d 1 (1st Cir.1983). On the authority of *Tastyeast,* we believe that we could and probably should deny all late charges requested by the Claimant, irrespective of what the CDCA may allow. The Claimant is already receiving pre-paid interest at a 25.4 annual percentage rate (APR) under the contract. No evidence of additional damages of anything close to $458.82 to the Claimant as a result of the Debtor's late payments has been suggested, much less supported by any evidence.

The citation of the Claimant and the PFSA to *Schleeter v. Intrieri,* 326 Pa.Super. 233, 473 A.2d 1067 (1984), is inapposite. *Schleeter* involved calculation of *interest,* a different element than the late charges which are sought to be imposed here *in addition to* an extremely high rate of interest in the contract, at 25.4 APR. It also cannot be overlooked that the *Schleeter* court recomputed a lower court award more generous to the mortgagee to provide the mortgagor with 15 percent interest on its money and no more. Here, it is the very lack of connection between the late charge imposed and the financial consequences to the Claimant which motivated our skepticism of the legitimacy of the Claimant's calculation of the late charges imposed. *See* The Opinion at page 681.

We also question whether the principle that deference must be accorded to a regulating agency's interpretation of a statute applies to anywhere near the same degree here as in the situations in the cases cited by the Claimant and the PFSA, if at all. Here, the DOB is merely giving a legal opinion. It has not promulgated any official regulation or interpretation construing the statute and regulation in issue. It is not defending an administrative interpretation of the regulation which it made in a proceeding involving the public fisc or involving its interests at all. Its counsel is simply, like us, looking at the words of an ambiguous statute and regulation and opining as to its interpretation.

We cannot equate the DOB's pronouncements here with that of a formal regulation or interpretation. *Compare, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 563–70, 100 S.Ct. 790, 795–96, 63 L.Ed.2d 22 (1980) (Official Staff Interpretation of

Truth-in-Lending Act by Federal Reserve Board must be accorded deference); *E.I. duPont deNemours & Co. v. Train,* 430 U.S. 112, 116–24, 97 S.Ct. 965, 969–73, 51 L.Ed.2d 204 (1977) (deference accorded to regulations promulgated by Federal Environment Protection Agency under statutorily-mandated procedure); *Masland v. Bachman,* 473 Pa. 280, 374 A.2d 517 (1977) (deference accorded to officially-promulgated state regulation). An official regulation or interpretation is promulgated only after some rule-making process occurs within an administrative agency. *See* 45 Pa.S. §§ 1201–08; and A.E. BONFIELD, STATE ADMINISTRATIVE RULE MAKING 255–396 (1986).

Also, the DOB's Brief fails to recite any factual basis or findings which support its interpretations. An agency normally supports promulgation of official regulations with factual findings. *See generally* 1 K. DAVIS, ADMINISTRATIVE LAW TREATISE 447–634 (2d ed. 1978). No facts supporting the DOB's interpretation are included in its Brief. The DOB's Brief merely presents, without any indication of a basis other than the ambiguous words of the pertinent CDCA statutory provision and regulation, what the DOB believes is the proper interpretation of this language.

The consideration of deference to an agency's interpretations is certainly considerable when a lawsuit involves a direct attack upon the agency's own interpretation of a regulation in a legal matter to which the agency is a party. *See, e.g., duPont deNemeurs, supra; Carol Lines v. Pennsylvania Public Utility Comm'n,* 83 Pa.Cmwlth. 393, 477 A.2d 601 (1984); *Spicer v. Commonwealth Dep't of Public Welfare,* 58 Pa.Cmwlth. 558, 428 A.2d 1008

(1981); and *Beneficial Consumer Discount Co. v. Whitesell,* 45 Pa.Cmwlth. 156, 404 A.2d 794 (1979). This is especially true when, as in *Carol Lines* and *Spicer,* the public fisc may be jeopardized by a court interpretation at variance from that of the agency. Here, the DOB is not a party to the action. The public fisc is in no way affected. Hence, the DOB has little stake in this matter and its views constitute strictly its own abstract interpretation of the statute and regulation at hand.

Nevertheless, the mere fact that the DOB has taken a certain interpretative position, which was not before us when we issued The Opinion, is an element entitled to some weight, no matter what context in which it is delivered. 1 Pa.C.S. § 1921(c)(8). The context is relevant only to the weight to be given to the agency's interpretation. *Cf. United Services Automobile Ass'n v. Muir,* 792 F.2d 356, 362 (3d Cir.1986) (administrative interpretation has insufficient weight to "settle" law for purposes of abstention under *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)). Here, we cannot give a great deal of weight to the DOB's statements.

The DOB clearly expresses its view that the use of the phrase "the amount in arrears" in 7 P.S. § 6213 K and the phrase "the amount in default" in 10 PA.CODE § 41.3(d) permit a CDCA licensee to compute late charges on the entire amount due. It then goes on to calculate, in almost blase fashion, the huge sum of late charges which results from its prescribed method of calculation, *i.e.,* a maximum sum of *$1,298.70* at the end of a 36–month contract such as in issue here.[1] Moreover, were it

---

1. The Brief of the DOB states the following, at pages 5–6:

"The interpretation that the default charge [proffered by the DOB] is based on the amount in arrears, and not on the amount of the installment, logically incorporates a progression from the $1.95 charge after the first month, to the $70.20 charge after the maturity of the loan. For example,

| Month | Default Charge |
|-------|----------------|
| 1 | $ 1.95 ($130 × .015) |
| 2 | $ 3.90 ($260 × .015) |
| 3 | $ 5.85 ($390 × .015) |
| 4 | $ 7.80 ($520 × .015) |
| 5 | $ 9.75 ($650 × .015) |
| 6 | $11.70 |
| 7 | $13.65 |
| 8 | $15.60 |

not for the intervention of the bankruptcy, the "additional late charges" sought by the Claimant would apparently, according to the DOB, also be collectible. See pages 677–78 of The Opinion.

The Debtor, it will be recalled, only borrowed about $3,000.00. *Id.* at 675. However, by use of the DOB's calculations, he would have to repay the original $4,680.00 including pre-computed interested at 25.4 percent, *plus* $1,298.70, or a total of almost $6,000.00 in the event that no payments were made after 36 months. Thus, he would be obliged to pay almost twice what he borrowed. This results in an effective annual percentage rate, in the transaction, when the interest and late charges are combined, approaching 50 percent.[2] Moreover, except for the intervention of bankruptcy, the "additional late charge" meter would still be running.

These observations would seem to us to cause the DOB to stop and wonder whether this method of calculation of late charges, with its pyramiding effect, was really what the legislature intended in using the language which it did in 7 P.S. § 6213 K. We would certainly expect such a rather unusual result to be spelled out more clearly in the statute if that was the intent.

We also note that the legislature expressly stated that "due notice" of the intention to collect late charges must be provided in the contract. 7 P.S. § 6215. We question whether the ambiguous contract language, see page 675 of The Opinion, fulfills this prerequisite.

Our observations of the consequences of interpreting the pertinent law and regulation otherwise should, if anything, heighten the attention due to the fact that home-purchase mortgagees consistently interpret late-charge provisions in their documents to allow late charges to be computed on only the current monthly payment. *See, e.g., Gambale, Andrews,* and *Dangler, supra.* We also note that the Uniform Consumer Credit Code, drafted in 1974, almost forty years after the CDCA, is more specific, and allows late charges of "not more than five per cent of the unpaid amount *of the installment* (emphasis added)." 7A UNIFORM LAWS ANNOTATED, § 2.502 (1985). This is, of course, how we suggest the CDCA could and should be read.

We therefore stand by our contentions that the interpretation of the statute and regulation urged by the Claimant and its

| Month | Default Charge |
|---|---|
| 9 | $17.55 |
| 10 | $19.50 ($1300 × .015) |
| 11 | $21.45 |
| 12 | $23.40 |
| 13 | $25.35 |
| 14 | $27.30 |
| 15 | $29.25 |
| 16 | $31.20 |
| 17 | $33.15 |
| 18 | $35.10 |
| 19 | $37.05 |
| 20 | $39.00 ($2600 × .015) |
| 21 | $40.95 |
| 22 | $42.90 |
| 23 | $44.85 |
| 24 | $46.80 |
| 25 | $48.75 |
| 26 | $50.70 |
| 27 | $52.65 |
| 28 | $54.60 |
| 29 | $56.55 |
| 30 | $58.50 ($3900 × .015) |
| 31 | $60.45 |

| Month | Default Charge |
|---|---|
| 32 | $62.40 |
| 33 | $64.35 |
| 34 | $66.30 |
| 35 | $68.25 |
| 36 | $70.20 ($4680 × .015) |

The total default charge in this example would be the sum of the charges or $1,298.70."

By summing the late charges due for each month, the DOB's calculations allow a pyramiding of late charges. For example, in Month 2, the lender is being permitted to collect the charges for month 1 plus the charges for month 2, or three times the 1½ percent late charge. By month 10, the lender is permitted to collect the charge for month 10, plus the sum of the charges from each of the prior months.

2. A finance charge of $2,700.00 on a loan of $3,000.00 for a period of 36 months constitutes an annual percentage rate of over 47.5 percent.

*amici* is doubtful, given the considerations that Pennsylvania law discourages unconscionable methods of calculating finance charges and refuses to enforce contract provisions which measure liquidated damages by amounts which are excessive in comparison with the damages suffered as a consequence. See pages 679–81 of The Opinion.

Because of our observations in cases involving claims for late charges by home-purchase mortgagees, we cannot attach great significance to the argument of the PFSA that all of its members calculate late charges under the CDCA in the same manner as the Claimant. It is not surprising that interested, sophisticated lenders consistently interpret ambiguous laws to their own advantage and to the disadvantage of their obviously less-sophisticated customers. This data only highlights the need of the disinterested courts to be vigilant to prevent industry-wide overreaching.

We therefore conclude that the articulated interpretation of the statute and regulation in issue by the DOB, though a factor, does not convince us that any of the reasoning of The Opinion was mistaken. We do, however, again observe that it was not necessary for us in The Opinion and is not necessary here to conclusively determine what late charges the CDCA would allow, since this issue is not determinative of the matter of the claim before us.

We reiterate that, here, The Order accompanying The Opinion was not conclusively based on any particular interpretation of 7 P.S. § 6213 K and 10 PA.CODE § 41.3(d). It was based on the failure of the Claimant to establish, on the record, the basis of its calculation for its requested late charges. The Opinion considered the ambiguity of the applicable law merely as an illustration as to why the claimant's calculation of late charges could not be assumed to be correct, and therefore would not be allowed as an element in its proof of claim, unless such calculations had been proven to be justified and accurate. By way of comparison, we did not doubt that the relatively conservative claim for late charges by the mortgagee in *Lewis* could have been explained by the mortgagee by reference to calculations which were in no sense violative of the law or the terms of the mortgage. However, we denied the mortgagee's claims in *Lewis* because, like the claimant here, the mortgagee there failed to meet its requisite burden of proving the basis for the late charges demanded on the record at the hearing on the Objections to its proof of claim.

Further, the *Tastyeast* decision suggests that, for equitable reasons, a bankruptcy court could decline to include all of the late charges sought by the Claimant as a portion of its allowed claim even if they were allowable under the CDCA. We therefore see no basis to reconsider the equitable result of denying such substantial late charges reached by The Order.

We have observed some typographical errors in The Opinion, and we shall enter an Order correcting these. However, we shall not withdraw The Opinion, but reiterate it insofar as it is further supported by our observations expressed here. We will reiterate that portion of The Order establishing the Claimant's allowed secured claim as $4,404.55. In the Order, we also indicate our intention to execute an Order approving the Trustee's Report and enter an Order confirming the Debtor's most-recently-amended Plan upon receipt of the said Report.